# In the United States Court of Federal Claims

No. 11-857 L

(Filed February 28, 2017)

| | | |
|---|---|---|
| * * * * * * * * * * * * * | * | |
| TRIN-CO INVESTMENT | * | |
| COMPANY and | * | |
| KATHLEEN G. ROSE, | * | |
| TRUSTEE of the V & M ROSE | * | Takings; Necessity Defense for |
| TRUST - MARITAL TRUST, | * | Fire-Fighting Actions On or |
| | * | Near National Forest; Reliability |
| *Plaintiffs*, | * | of Expert Opinion; Genuine |
| | * | Disputes of Material Fact |
| v. | * | Preclude Summary Judgment. |
| | * | |
| THE UNITED STATES, | * | |
| | * | |
| *Defendant.* | * | |
| * * * * * * * * * * * * * | * | |

*Wesley R. Higbie*, Sausalito, CA, for plaintiff.  *Matthew J. Dowd*, Washington, DC, of counsel.

*Jessica M. Held*, United States Department of Justice, with whom was *John Crudden*, Assistant Attorney General, Washington, DC, for defendant.

_____

## OPINION AND ORDER

_____

**BUSH**, *Senior Judge*.

This takings case is before the court on cross-motions for summary judgment filed under Rule 56 of the Rules of the United States Court of Federal

Claims (RCFC).  The summary judgment motions have been fully briefed; oral argument was held, at plaintiffs' request, on February 14, 2017.  For the reasons stated below, the parties' motions, which attempt to resolve the question of the government's liability, if any, for fire damage to plaintiffs' timberland, are denied in their entirety.

## BACKGROUND[1]

### I.    Relevant Facts

Plaintiffs (collectively, Trin-Co) own five non-contiguous parcels of timberland that are the subject of the takings claims set forth in the complaint. The names of these parcels are Squaw Camp, Price Creek, Mud Springs, Eltapom Rose, and V&M Bottoms.  Am. Compl. ¶¶ 10-14.  These properties range in size from approximately 714 acres to approximately 57 acres.  *Id.*  These five parcels are either completely surrounded by, or adjacent to, Shasta-Trinity National Forest (the National Forest) in Trinity County, California.  *Id.*

In the summer of 2008, a number of wildfires collectively known as the Iron Complex fires or the Iron-Alps Complex fires threatened the National Forest as well as private lands and communities in Trinity County.  The two fires most pertinent to the damage on plaintiffs' properties were the Cedar Fire and the Eagle Fire.  The Cedar Fire burned from June 20-21 to July 30, 2008 and extended through 25,373 acres of land.  Pls.' Facts ¶¶ 18, 20; Def.'s Facts ¶ 6.  Most of the affected acreage, 24,465 acres, was in the National Forest, but 907 acres of private land were burned as well.  Pls.' Facts ¶ 20.  The Eagle Fire burned from June 20-21 to September 1, 2008 and extended through 32,059 acres of land.  Pls.' Facts ¶¶ 18, 20; Def.'s Facts ¶ 6.  Most of the affected acreage, 28,591 acres, was in the National Forest, but 2076 acres of private land were burned as well.  Pls.' Facts ¶ 20.

The United States Forest Service directed the fire-fighting efforts against the Cedar and Eagle Fires.  A technique used to fight these fires was containment through indirect attack, where containment lines were established some distance

---

[1]/ The court makes no findings of fact in this opinion.  The facts recounted here are taken from the parties' filings to provide context for the resolution of the parties' cross-motions.

from the lead edge of the advancing wildfires.  To render these containment lines more effective, the Forest Service burned forested land in some locations, whether the land in question was part of the National Forest or privately owned, in order to reduce the opportunity for the advancing wildfire to breach the containment line.

Where defensive fires in these indirect attacks were set by the Forest Service, the practice is referred to as backburning or firing.  There is no dispute that the Forest Service fired all of plaintiffs' V&M Bottoms parcel and a portion of plaintiffs' Mud Springs parcel.  A dispute remains, however, as to the overall extent of the backburning of plaintiffs' timberland by the Forest Service.

## II.    Procedural History

Plaintiffs' takings claims, filed December 7, 2011, were initially dismissed by this court for failure to state a claim upon which relief can be granted.  *TrinCo Inv. Co. v. United States*, 106 Fed. Cl. 98, 102 (2012) (*Trin Co I*), *rev'd*, 722 F.3d 1375 (Fed. Cir. 2013) (*Trin Co II*).  The trial court reasoned that the government was not required to compensate plaintiffs for actions taken to prevent the spread of a wildfire.  *Id.*  Upon appeal, that dismissal was reversed and remanded.  *Trin Co II*, 722 F.3d at 1381.

The United States Court of Appeals for the Federal Circuit disagreed with the trial judge's assessment of takings jurisprudence.  The Federal Circuit held:

> In the proceedings below, the Government advanced, and the [trial court] accepted, the position that any act undertaken by the Government in connection with fighting a fire is covered by the necessity defense. Therefore, the court found that TrinCo's complaint could not support a claim for relief because the complaint acknowledged that TrinCo's property was taken by the Government while fighting the Iron Complex fire of 2008.
>
> [H]owever, every taking by the Government in the name of fire control does not automatically qualify as a necessity sufficient to satisfy the requirements of the

3

necessity defense. The necessity defense is just what it says it is: a defense. It has always required a showing of imminent danger. The use of the word "necessity" in the title is no accident. The defense requires both an actual emergency and an imminent danger met by a response that is actually necessary. Not every seizure of a private citizen's property will qualify.

*Trin Co II*, 722 F.3d at 1380. Upon remand, the parties engaged in discovery. On June 23, 2015, this case was randomly assigned to the undersigned judge. Discovery was completed by June 20, 2016.

Nearing the close of the discovery period, the parties were prepared to seek summary judgment on the issue of the government's liability for plaintiffs' takings claims. The court was not opposed to the filing of summary judgment briefs, although the susceptibility of the parties' dispute to resolution upon summary judgment was uncertain at that time. Order of Apr. 21, 2016, at 6 n.3. Hundreds of pages of briefs, proposed findings of uncontroverted fact, and exhibits were eventually filed with the court in support of the parties' cross-motions for summary judgment. As discussed below, the parties dispute almost every fact that is material to plaintiffs' takings claims and the government's necessity defense against those claims.

## III. Questions Presented

The principal question before the court is whether the government's defense to plaintiffs' takings claims is amenable to resolution on summary judgment. The government asserts its defense under the aegis of the doctrine of necessity, *i.e.*, that any damage to plaintiffs' timberland that might otherwise be considered a taking is excused and rendered non-compensable by the actual necessity of the fire-fighting efforts employed by the Forest Service. A secondary and threshold issue is whether plaintiffs have persuaded the court that the expert opinions of two of the government's wildfire experts must be excluded under the reliability test established by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). There is also a controversy regarding the extent of the Forest Service's backburning of plaintiffs' five properties.

# DISCUSSION

## I. Standard of Review

"[S]ummary judgment is a salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987) (internal quotations and citations omitted). The party moving for summary judgment will prevail "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). Cross-motions for summary judgment "are not an admission that no material facts remain at issue." *Massey v. Del Labs., Inc.*, 118 F.3d 1568, 1573 (Fed. Cir. 1997) (citing *United States v. Fred A. Arnold, Inc.*, 573 F.2d 605, 606 (9th Cir. 1978)). The parties may focus on different legal principles and allege as undisputed a different set of facts. *Id.* "Each party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts." *Id.*

A genuine dispute of material fact is one that could "affect the outcome" of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party . . . need not produce evidence showing the absence of a genuine issue of material fact but rather may discharge its burden by showing the court that there is an absence of evidence to support the nonmoving party's case." *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). A summary judgment motion is properly granted against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case and for which that party bears the burden of proof at trial. *Celotex*, 477 U.S. at 324.

The United States Supreme Court has instructed that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48. A nonmovant will not defeat a motion for summary judgment "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249 (citation omitted). "A nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will

bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law." *Dairyland*, 16 F.3d at 1202 (citing *Celotex*, 477 U.S. at 323).

## II.   Analysis

### A.   Admissibility of Expert Testimony Proffered by the Government

Plaintiffs argue that the expert opinions of Mr. Phil Perkins and Mr. Charles E. Stanich, two of the experts relied upon by the government in this case, must be excluded under *Daubert* and Rule 702 of the Federal Rules of Evidence (FRE 702).[2]  In essence, plaintiffs assert that Mr. Perkins and Mr. Stanich have not provided reliable expert testimony that will assist the finder of fact.  Among other critiques, plaintiffs insist that the testimony of defendant's experts fails to meet the multi-factor reliability test[3] plaintiffs derive from *Daubert*:

---

[2]/  According to this rule of evidence:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

[3]/  The multi-factor reliability test in *Daubert* can be summarized in a number of ways, including this version:

> (1) the testability of the hypothesis; (2) whether the theory or technique has been subject to peer review and publication; (3) the known or potential rate of error; and (4) whether the technique is generally accepted.

*Libas, Ltd. v. United States*, 193 F.3d 1361, 1366-67 (Fed. Cir. 1999) (citing *Daubert*, 509 U.S. at 593-94).

> (1) whether the expert's theory can be or has been tested
> or challenged in some objective sense, or whether it is
> instead simply a subjective, conclusory approach
> incapable of being reasonably assessed for reliability;
> (2) whether the theory has been subject to peer review
> and publication; (3) the known or potential rate of error
> of the theory; (4) the existence and maintenance of
> standards and controls; and (5) whether the technique or
> theory has been generally accepted in the scientific
> community.

Pls.' Mot. at 29-30.

Defendant rejects this critique of its experts, stating that the *Daubert* factors are "non-definitive" and that the *Daubert* inquiry is a "'flexible one.'" Def.'s Mot. at 22-23 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). The court agrees that the *Daubert* factors are non-definitive and that the *Daubert* inquiry is a flexible one. *See, e.g.*, *Kumho Tire*, 526 U.S. at 151 (stating that *Daubert* "made clear that its list of factors was meant to be helpful, not definitive" and noting that the *Daubert* factors "do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged"). As the gatekeeper of reliable expert testimony the trial judge "should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Id.* at 152. "In other cases, the relevant reliability concerns may focus upon personal knowledge or experience." *Id.* at 150.

Given that a trial court has latitude in crafting a test to gauge the reliability of expert witnesses, *id.* at 152, and given the clear precedent stating that the *Daubert* factors are not definitive, *id.* at 151, this court rejects a rigid application of the *Daubert* factors here. First, as the government notes in its reply brief, two of plaintiffs' own experts, like Mr. Perkins and Mr. Stanich, do not appear to satisfy all factors of the *Daubert* test for reliable expert opinion. *See* Def.'s Reply at 18-19. Plaintiffs' emphasis on the *Daubert* factors focuses too much, in the court's view, on scientific publications as a measure of the reliability of *both* defendant's and plaintiffs' experts.

Second, personal experience and qualifications underlie the testimony of

defendant's experts.  Mr. Perkins and Mr. Stanich offer expert opinions on wildfire behavior and wildfire fire-fighting, topics which have been an integral focus of their careers.  Nothing in the recitation of the experience and qualifications of Mr. Perkins and Mr. Stanich suggests that their opinions on these topics are unreliable simply because these gentlemen have not published peer-reviewed articles in scientific journals.  Under *Kumho Tire*, defendant's experts are sufficiently reliable to proffer expert opinions in this case, even if their opinions do not satisfy every *Daubert* factor.

Plaintiffs also argue that the opinions of Mr. Perkins and Mr. Stanich are too subjective to be reliable.  Pls.' Mot. at 31-34; Pls.' Reply at 5-9.  The court would agree with plaintiffs that completely subjective expert opinion that is incapable of being tested for validity would fail the reliability test set forth in *Daubert* and *Kumho Tire*.  *See, e.g.*, *Kumho Tire*, 526 U.S. at 150-52 (noting that the reliability inquiry examines whether the expert displays intellectual rigor and an acceptable analytical foundation for his or her opinion).  But the court cannot agree with plaintiffs that the expert opinions of Mr. Perkins and Mr. Stanich are unreliable because these opinions are purely subjective.

As defendant notes, Mr. Perkins and Mr. Stanich relied on their experience and qualifications, as well as their analyses of extensive documentary and physical evidence, for their expert opinions.  Def.'s Mot. at 24; Def.'s Reply at 17-19.  The conclusions in their expert reports cannot be equated to "I know it when I see it," as alleged by plaintiffs.  *See* Pls.' Mot. at 34.  While it is true that their opinions include terms which have a subjective component, such as "extreme fire behavior," *see id.* at 33, the presence of such terms, in the circumstances of this case, goes more to the weight of the expert opinion presented by defendant, not to its reliability.  *Cf. Ark. Game & Fish Comm'n v. United States*, 736 F.3d 1364, 1378 (Fed. Cir. 2013) (holding that a trial court could reject a *Daubert* challenge to expert opinion which was based on personal experience rather than science, and that it was not an abuse of discretion to weigh competing evidence on the topic).  Having reviewed the expert reports challenged by plaintiffs, as well as the excerpts of deposition testimony elicited from Mr. Perkins and Mr. Stanich, the court finds no reason to reject their opinions as unreliable under *Daubert* or FRE 702.

The court, in its gatekeeper role, has closely examined the expert reports of

Mr. Perkins and Mr. Stanich to determine if they are reliable. Precedent requires that the court assure itself that expert testimony is reliable. *See, e.g.*, *Libas, Ltd. v. United States*, 193 F.3d 1361, 1367 (Fed. Cir. 1999) (holding in that case that either "a *Daubert*-style analysis" or "some other equally searching" analysis was required). The reports of Mr. Perkins and Mr. Stanich are by no means "conclusory," as alleged by plaintiffs. Pls.' Reply at 5-6, 9. Each of the reports presents thorough and detailed analyses of issues central to the resolution of plaintiffs' claims. Given the extensive experience of Mr. Perkins and Mr. Stanich, as well as the depth of the analysis presented in their reports, the court cannot exclude their expert reports as unreliable.

Finally, the court addresses two additional challenges to the reliability of the government's experts raised by plaintiffs. First, plaintiffs seek to exclude the expert opinions of Mr. Perkins and Mr. Stanich because, in their view, neither expert addresses the topic of necessity, in the context of a necessity defense to a takings claim. Pls.' Mot. at 31; Pls.' Reply at 6. As defendant notes, however, an expert opinion may assist the trier of fact even if the expert does not opine on the ultimate legal issue in the case. Def.'s Reply at 16 (citing *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)). The court's analysis of the government's necessity defense will involve a multi-pronged inquiry, and the opinions of Mr. Perkins and Mr. Stanich are relevant to the component parts of that inquiry.

Second, plaintiffs allege that Mr. Perkins, in particular, did not conduct an independent analysis of the wildfires and fire-fighting at issue in this case but merely rubber-stamped the Forest Service's actions. Pls.' Mot. at 32; Pls.' Reply at 6-8. The court considers this to be an inaccurate summary of the two expert reports submitted by Mr. Perkins. Although Mr. Perkins does conclude that Forest Service actions taken to combat the Iron Complex fires were appropriate, his opinions are grounded in documentary evidence and his analysis of that evidence. *See* Def.'s Exs. 1, 15. Defendant also notes that Mr. Perkins' conclusions were based, in part, on a visit to the areas burned by the Cedar and Eagle Fires. Def.'s Mot. at 24; Def.'s Reply at 17. Although plaintiffs may disagree with Mr. Perkins as to the appropriateness of the fire-fighting efforts of the Forest Service, this disagreement with his conclusions does not show that the expert opinions of Mr. Perkins are unreliable.

For all of the above reasons, plaintiffs' reliability challenge to the expert

opinions of Mr. Perkins and Mr. Stanich must be rejected.  The opinions expressed by Mr. Perkins and Mr. Stanich are not required by binding precedent to satisfy all *Daubert* factors.  Under close examination, the reports of these two experts show intellectual rigor and an acceptable analytical foundation.  *Kumho Tire*, 526 U.S. at 150-52.  The court will consider the opinions of Mr. Perkins and Mr. Stanich in its resolution of the parties' cross-motions for summary judgment.[4]

## B.   Necessity Defense and Disputed Material Facts

### 1.   Legal Standard

The parties seek summary judgment on the government's liability, if any, for fire damage to plaintiffs' land during the Iron Complex fires.  Central to this dispute is an application of the holding of *Trin Co II* to the facts developed by the parties through discovery.  *Trin Co II* rejected any "automatic[]" application of the necessity defense to a takings claim where the fire damage to private timberland was caused by the government's fire-fighting in response to a wildfire.  722 F.3d at 1380.  The Federal Circuit noted that, as of 2013, "there [wa]s no case law on point" for the subject matter.  *Id.* at 1378.

At the outset, the court notes that *Trin Co II* is silent as to whether the necessity defense raised by the government here is susceptible to resolution on summary judgment.  Takings cases are typically fact-specific and often turn on facts that are developed at trial.  *See, e.g.*, *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed. Cir. 1983) ("The fact-intensive nature of just compensation jurisprudence to date, however disorienting in other contexts, argues against precipitous grants of summary judgment.").  The only doctrine of necessity case involving fire-fighting cited in the Federal Circuit's opinion was a case resolved not on summary judgment but after trial.  *Bowditch v. City of Boston*, 101 U.S. 16, 17-18 (1879).  In the absence of any clear direction from the Federal Circuit as to whether the validity of the necessity defense raised in this case may be resolved on summary judgment, the court applies the general standard:

---

[4]/  The court's ruling in this regard is relevant to any pre-trial motions contemplated by the parties.  *See* Pls.' Reply at 5 n.1.

> Each party carries the burden on its own motion to show
> entitlement to judgment as a matter of law after
> demonstrating the absence of any genuine disputes over
> material facts.

*Massey*, 118 F.3d at 1573.

The takings law concept to be applied here is most succinctly provided by this statement in *Trin Co II*:

> The [necessity] defense requires both an actual
> emergency and an imminent danger met by a response
> that is actually necessary.

722 F.3d at 1380. The court must agree with defendant that *Trin Co II* offers only "limited guidance as to the actual application of the necessity doctrine" to the facts of this case.[5] Def.'s Reply at 1. The facts produced through discovery must be examined for evidence of an "actual emergency" and an "imminent danger" that were "met by a response that [was] actually necessary." *Trin Co II*, 722 F.3d at 1380.

The necessity defense test set forth in *Trin Co II* contains two prerequisites which, in the court's view, are specific but somewhat subjective in their definition: "actual emergency" and "imminent danger." Nonetheless, during trial a judge would weigh all evidence, conflicting or not, to determine whether these two prerequisites of the necessity defense were present in a particular fire-fighting scenario. It might be possible to determine on summary judgment whether a particular period of time in the Iron Complex fires history constituted an actual emergency and posed imminent danger, but that determination on summary judgment would require that there be no genuine disputes of material fact. Here, as explained below, many material facts are in genuine dispute.

---

[5] The court notes that two of the cases cited approvingly in *Trin-Co II* for their analyses of the necessity defense, *Customer Co. v. City of Sacramento*, 895 P.2d 900 (Cal. 1995) and *Steele v. City of Houston*, 603 S.W.2d 786 (Tex. 1980), are not in perfect harmony. *See Customer*, 895 P.2d at 912-13 (declining to follow *Steele* because "[t]he opinion in *Steele* is poorly reasoned and internally inconsistent").

Turning to the third component of the necessity defense identified in *Trin Co II*, the phrase "met by a response that is actually necessary" is not defined. *See also Trin Co II*, 722 F.3d at 1380 (noting that in this case "there are legitimate questions as to imminence, necessity and emergency"). Perhaps the words "actually necessary" refer to a response that is appropriate in light of the emergency and danger confronted by the fire-fighters. Another possibility is that "actually necessary" functions as a synonym for "reasonably necessary," a term which finds its application in regulatory takings caselaw. *See Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 127 (1978) (stating that government action which imposes "a use restriction on real property may constitute a 'taking' *if not reasonably necessary* to the effectuation of a substantial public purpose") (emphasis added) (citations omitted). Yet another possible definition, one gleaned from defendant's reply brief, is that an "actually necessary" response is synonymous with a "direct response to the imminent danger to life and property created by the Iron Complex fires." Def.'s Reply at 2.

Plaintiffs' position on the operational definition of "actually necessary" was not made fully clear to the court until oral argument, although the headings of relevant sections of plaintiffs' briefs provided a preview of their position. First, in plaintiffs' moving brief, Trin-Co alleged that "Defendant's Experts Acknowledge that Alternative Actions Were Feasible, Thereby Contradicting Defendant's Necessity Defense." Pls.' Mot. at 34. Next, in plaintiffs' reply brief, Trin-Co asserts that "The Doctrine of Necessity is [Not] Available as a Defense . . . When Viable, Alternative Options Exist." Pls.' Reply at 2. At oral argument, plaintiffs' counsel asserted that for government action which destroys private property to be "actually necessary," the destructive course of action must be the *only* feasible or realistic course of action available. Oral Argument Transcript (Tr.) at 2:59-3:06 PM, 3:59-4:00 PM. In the context of the Iron Complex fires, in other words, plaintiffs argue that because there were multiple potentially effective fire-containment strategies available, the Forest Service could not choose an alternative which involved the backburning of private property without becoming liable for a taking. *Id.*

Plaintiffs cite no authority for their contention that 'only when there is but one feasible option in an emergency can there be actual necessity.' Plaintiffs' view of the law, based on the court's research, appears to be an outlier. A more common thread in necessity defense cases is a concern that the destruction of

private property have a reasonable basis, *i.e.*, that at the time of the emergency the course of action chosen by the government was a reasonably tailored response to imminent danger under the circumstances. In one such case, a treatise was cited for this elucidation of the doctrine of necessity:

> "When immediate action is necessary in order to avert a great public calamity, private property may be controlled, damaged or even destroyed without compensation. Under such conditions any individual has the right to enter another's land and destroy his property, and if he acts *with reasonable judgment* he is not liable to the owner. If the individual who thus enters and destroys private property happens to be a public officer whose duty it is to avert the impending calamity, the rights of the owner of the property to compensation are no greater."

*Short v. Pierce Cty.*, 78 P.2d 610, 615 (Wash. 1938) (emphasis added) (quoting 1 *Nichols on Eminent Domain*, 2d ed., § 96, p. 263); *see* 1 Julius L. Sackman, *Nichols on Eminent Domain*, § 1.43[1]-[2] (3d ed. 2016) (same); *cf. Miller v. Schoene*, 276 U.S. 272, 280 (1928) (sanctioning the necessity of the destruction of cedar trees on private property to protect apple trees on private property, and noting that the choice was "controlled by considerations of social policy *which are not unreasonable*") (emphasis added); *Phoenix Assurance Co. of London v. Fire Dep't of Montgomery*, 23 So. 843, 848-49 (Ala. 1898) ("The duty of aiding and assisting in the prevention or suppression of conflagrations resting upon every citizen having the physical ability for its performance, the freedom from all liability if the necessity is actual or *reasonably apparent* is of the same grade and character with that of the rendition of military service.") (emphasis added). In the court's view, takings jurisprudence demands that the government's response to an actual emergency and imminent danger simply be reasonable in order to satisfy a necessity defense, not that every damaged property owner must be compensated if there are multiple feasible responses available to emergency responders.[6]

---

[6]/ Under plaintiffs' view of the necessity defense, whenever fire-fighters have more than one feasible fire-fighting strategy to choose from, all private property damage is compensable as

(continued...)

One of the cases cited approvingly in *Trin Co II* supports the court's view of the necessity defense, *i.e.*, that a governmental response to an actual emergency and imminent danger is actually necessary if it is a *reasonable* response under the circumstances. The Supreme Court of Texas indicated that a city government's necessity defense could be valid "'so long as the emergency is great enough, and [the city] has acted reasonably under the circumstances.'" *Steele v. City of Houston*, 603 S.W.2d 786, 792 (Tex. 1980) (quoting W. Prosser, *Law of Torts* § 24 (4th ed. 1971)). The court finds far greater support for a reasonableness requirement than for a strict limitation of the necessity defense to those situations where only one possible emergency response is feasible.

The court now turns to the only judicial decision which has applied the holding of *Trin Co II* to a wildfire fire-fighting situation. That case, *Brewer v. State*, 341 P.3d 1107 (Alaska 2014), extensively quoted *Trin Co II* and embraced the Federal Circuit's framework for determining when a necessity defense would excuse government-caused fire damage to private property while fighting a wildfire.[7] *Id.* at 1116-18. The Supreme Court of Alaska noted, first, that the inquiry is fact-specific and will vary from case to case. *Id.* at 1118 n.68 (citing *United States v. Caltex (Phil.), Inc.*, 344 U.S. 149, 156 (1952) and *Mitchell v. Harmony*, 54 U.S. 115, 134 (1851)). The Alaskan court also provided a temporal framework for the inquiry:

> This inquiry should not devolve into an after-the-fact evaluation of the wisdom of the fire-fighting policies and tactical choices that preceded the taking . . . . Whether a taking is necessary must be judged at the time the taking

---

[6](...continued)
a taking, no matter how great the emergency and no matter how imminent the threat to life and property. Oral Argument Transcript at 2:59-3:06 PM, 3:59-4:00 PM. According to plaintiffs' view of the law, therefore, even if *all* feasible options at the time involve damage to private property, the necessity defense cannot apply and the government must always pay compensation, even if the fire-fighters have made a reasonable, or even, in hindsight, the optimum choice, among many. Plaintiffs' necessity defense interpretation is extreme and unsupported by *Trin-Co II* or any of the cases cited therein.

[7]/ The *Brewer* court left it to the trial court's discretion to choose between trial or summary judgment proceedings in order to resolve the necessity defense dispute in that case on remand. 341 P.3d at 1118.

> occurs.  The essence of the doctrine is that the
> government is acting "under pressure of public necessity
> and to avert impending peril" and chooses to damage
> private property as the lesser of two evils.  It is that
> choice, in that moment, for which necessity may provide
> a defense.

*Id.* at 1118 & n.69 (quoting *Customer Co. v. City of Sacramento*, 895 P.2d 900, 910 (Cal. 1995), a case also relied upon by the Federal Circuit in *Trin Co II*).

While *Brewer* is not precedent controlling upon this court, the court finds therein two important guides for determining when a necessity defense excuses damage caused by government agencies fighting wildfires.  First, the inquiry is fact-specific and must take into account the particular facts of each case.  *Brewer*, 341 P.3d at 1118 n.68.  Actual necessity, therefore, is determined on a case-by-case basis.  *Id.*; *see also Trin Co II*, 722 F.3d at 1379 (quoting *Caltex*, 344 U.S. at 156, for the proposition that each necessity defense case "'must be judged on its own facts'").

Second, the court adopts *Brewer*'s temporal framework for the necessity defense analysis.  "Whether a taking is necessary must be judged at the time the taking occurs."  *Brewer*, 341 P.3d at 1118.  This approach is consistent with *Trin Co II* and highly persuasive.  *Cf. Trin Co II*, 722 F.3d at 1380 (exploring, in part, "legitimate questions of imminence, necessity and emergency" by examining the extent of wildfire damage to the National Forest "at the time TrinCo's property was burned").  Thus, the necessity of an "actually necessary" response, *id.*, must be measured *at the time of the actual emergency and imminent danger*, not in hindsight.

The court therefore construes the necessity defense elucidated in *Trin Co II*, as it applies to wildfire situations, in the following manner.  Two prerequisites, an actual emergency and imminent danger, must be present to mount a successful necessity defense.  If those two prerequisites are satisfied, the court turns to the "actually necessary" component of the necessity defense.  For this inquiry, the government's response to a wildfire will be analyzed on a case-by-case, fact-specific basis.  In addition, the necessity of the agency's fire-fighting response will be measured at the time of the actual emergency and imminent danger, not in

hindsight, and must take into account the information available to the fire-fighters at that time. Finally, the fire-fighting decisions of the agency which damaged private land must have been reasonable under the circumstances.

## 2.    Genuine Disputes of Material Fact

The court has closely examined the parties' briefs, proposed uncontroverted facts, exhibits and their contentions of fact presented at oral argument. Although the primary and arguably narrow focus of these documents and contentions of fact is on the government's liability, if any, for fire damage to plaintiffs' properties, the array of disputed material facts is daunting. In the interest of brevity, the court will discuss only a representative number of these disputes of material fact here.

### a.    Did the Iron Complex Fires Constitute an Actual Emergency?

The parties dispute whether the Iron Complex fires constituted an actual emergency that would support the government's necessity defense. Defendant consistently maintains that any government-caused damage to plaintiffs' properties occurred in the context of an actual emergency:

> [T]he facts relative to the wildfires that made up the Iron Complex – the location and number of the fires, the dry conditions, terrain, and available resources – fully support the conclusion that those wildfires presented an imminent danger and actual emergency that gave rise to the actual necessity of the Forest Service's actions to limit and prevent their further spread.

Def.'s Reply at 2. Defendant points to documentary evidence and expert reports in support of its characterization of the Iron Complex fires as an actual emergency. Def.'s Facts ¶¶ 1-5. Plaintiffs dispute the dryness of the conditions and the steepness of the terrain. Pls.' Resp. to Def.'s Facts ¶¶ 1, 4. Plaintiffs also dispute, generally, that any takings of their trees occurred in emergency conditions. *See* Pls.' Reply at 2 (stating that "the evidence does not establish that an 'actual emergency' existed at the properties when Defendant took its actions"); Tr. at 3:50-3:55 PM.

One of plaintiffs' experts concluded that the "spread rate" of the Cedar and Eagle Fires was "small in comparison to other recent fires in California." PX 17, at P0250. Another of plaintiffs' experts concluded that the fire behavior of the Iron Complex fires was "moderated" by weather conditions and "high fuel moistures." PX 20, at P0315. At oral argument, plaintiffs' counsel asserted that the evidence did not necessarily support a finding that an actual emergency existed at each point in time when plaintiffs' land was damaged. Tr. at 3:50-3:55 PM.

The court finds that it would be inappropriate, on summary judgment, to weigh competing evidence as to whether actual emergency conditions were present at the time each taking is alleged to have occurred. *Anderson*, 477 U.S. at 255 (noting that a judge should not weigh evidence when the dispute is at the summary judgment stage of proceedings). Although there is no dispute that a state of emergency was declared by both the governor of California and the President of the United States, the court finds that a genuine dispute of material fact exists as to whether an actual emergency excused any damage the Forest Service caused to plaintiffs' five parcels of land. Even this question, perhaps the least hotly disputed element of the necessity defense asserted by the government in this case, cannot be resolved on summary judgment.

### b.    Did Imminent Danger Threaten Life and Property?

The parties vigorously dispute whether the Cedar and Eagle Fires posed an imminent danger at the times of the alleged takings. Plaintiffs consistently assert that there was no imminent danger from these fires when the Forest Service backburned acreage on or near plaintiffs' five parcels. *See* Pls.' Reply at 2, 12, 14. Plaintiffs rely primarily on the opinions of their expert Mr. Joe Waterman. *See* PX 19, at P0286, P0293, P0294, P0297; PX 20, at P0314, P0317. The United States disagrees with the "imminent danger" assessment by Mr. Waterman. Def.'s Reply at 2, 7-13. The government relies upon contemporaneous documentation of these fires and upon its own experts. *Id.*

The court finds that it would be inappropriate, on summary judgment, to weigh competing evidence as to whether imminent danger was present at the time each taking is alleged to have occurred. *See Anderson*, 477 U.S. at 255. There is no dispute that the Iron Complex fires were dangerous and that lives were lost while fighting these fires. However, the court finds that a genuine dispute of

material fact exists as to whether, in the context of the government's necessity defense, imminent danger threatened lives and property at the times when the Forest Service is alleged to have caused fire damage to plaintiffs' five parcels of land. For this reason, neither party can be granted summary judgment on the "imminent danger" prerequisite for the government's necessity defense.

### c. Were the Forest Service's Backburning Actions Actually Necessary?

To review, the government's backburning actions, in order to be characterized as "actually necessary," *Trin Co II*, 722 F.3d at 1380, must have reasonably responded to the threat of further expansion of the Cedar and Eagle Fires, based on information available at that time. *See supra*. In other words, the backburning undertaken by the Forest Service must have been a reasonable response in order to escape liability under the Takings Clause of the Fifth Amendment. This analysis depends on the particular facts of the Forest Service's fire-fighting actions, the particular facts of plaintiffs' properties and surrounding geography, and the particular facts of the Cedar and Eagle Fires.

The parties are worlds apart as to whether the Forest Service's backburning near or on plaintiffs' five properties was actually necessary. Plaintiffs assert, through expert reports, that the Forest Service did not appropriately weigh the destruction of private property against threats to life and property from the advancing Cedar and Eagle Fires. *See* PX 18, at P0273; PX 19, at P0286, P0291-P0297; PX 20, at P0316- P0318. Plaintiffs also contend, relying on contemporaneous documents, that the Forest Service inappropriately valued cost-savings over the protection of private property. *See* Pls.' Mot. at 1, 4-5, 36; Pls.' Reply at 1, 4-5, 11; Pls.' Facts ¶¶ 16, 27-29, 117; PX 22, at P0340-P0342.

The government, on the other hand, asserts that fire-fighting resources were limited during the summer of 2008 due to a large number of wildfires in California. *See* Def.'s Mot. at 10; DX 3; DX 4. Defendant therefore argues that indirect attack and backburning were necessary and reasonable tools used to combat the Cedar and Eagle Fires. Def.'s Mot. at 10. The government's experts opine, for example, that indirect attack was often safer than direct attack during the Iron Complex fires. DX 4, at D0172; DX 15, at D0450-D0451; DX 22, at D0499. Defendant also asserts that the alternative fire-fighting strategies

18

proposed by plaintiffs' experts, developed after review of the record many years after the summer of 2008, run counter to the rule in *Brewer* that necessity be measured at the time of the alleged taking.  Def.'s Reply at 9 (citing *Brewer*, 341 P.3d at 1118).

Defendant offers an analysis of Forest Service fire-fighting activities on or near each of plaintiffs' five parcels, whether or not the government agrees that the fire damage on that parcel was caused by Forest Service backburning.  Def.'s Mot. at 12-21.  For the V&M Bottoms parcel, for example, the backburning was described by defendant's experts as safer than a direct attack and ultimately effective in stopping the Cedar Fire which was fully contained four days later.  *Id.* at 13-14.  For the Price Creek parcel, the government's experts conclude that indirect attack was safest in this area and that the containment lines were meant to prevent the spread of the Eagle Fire into plaintiffs' Mud Springs parcel and the community of Big Bar.  *Id.* at 20-21.  Although not stated in precisely the language of the court's elucidation of the "actually necessary" component of the necessity defense, it is clear that defendant's evidence goes to the reasonableness of the backburning on or near plaintiffs' parcels.  Finally, the government also asserts that the Forest Service did not sacrifice the interests of private landowners merely to cut costs in its fire-fighting operations.  Def.'s Reply at 3-6.

The parties' conflicting evidence in this regard is sufficient to create a genuine dispute of material fact.  It would be inappropriate, on summary judgment, to weigh competing evidence as to whether the Forest Service's backburning on or near plaintiff's five parcels of timberland was "actually necessary."  *See Anderson*, 477 U.S. at 255.  For this reason, neither party can be granted summary judgment on the "actually necessary" component of the government's necessity defense.

### C.   What Extent of the Fire Damage on Plaintiffs' Five Parcels Was the Result of the Forest Service's Backburning?

Finally, it is important to note that the government raises an additional, partial defense to liability for plaintiffs' takings claims.  Def.'s Mot. at 26-27.  This second defense is raised in the alternative and in addition to the government's necessity defense arguments.  *Id.*  In essence, this second defense states that for three of plaintiffs' properties, all fire damage was the result of advancing

19

wildfires, not backburning.  For the remaining two properties, the government contends that there is disputed evidence as to the number of acres burned by advancing wildfires, versus the number of acres burned by the Forest Service's backburning.  Plaintiffs disagree with defendant's contentions of fact in this regard.

Simply put, the parties are largely engaged in a battle of experts as to the fire damage on plaintiffs' properties, with a focus on the movement of the Cedar and Eagle Fires through these areas and the extent of the impacts of the Forest Service's backburning.  Plaintiffs rely extensively on Dr. Christopher W. Lautenberger, while the government relies extensively on Mr. Perkins.  Although the battle is fiercely joined and supported by a great deal of evidence on both sides, it is not amenable to resolution on summary judgement because there are genuine disputes of material fact.  The court cannot grant either party summary judgment on this aspect of the government's potential liability for fire damage because there is sufficient evidence for either nonmovant to prevail.  *Anderson*, 477 U.S. at 248-49.  Neither plaintiffs nor the government is entitled to summary judgment on the disputed factual issue of wildfire-related versus backburning-related fire damage on plaintiffs' properties.

## CONCLUSION

Plaintiffs' reliability challenge to the expert opinions of Mr. Perkins and Mr. Stanich, under *Daubert* and FRE 702, is rejected.  In addition, the evidence presented by the parties creates a genuine dispute as to all three components of the government's necessity defense.  Further, the extent of backburning-related fire damage on plaintiffs' properties remains in genuine dispute.  Because genuine issues of material fact preclude a ruling on summary judgment regarding the government's liability for the fire damage on plaintiffs' timberland, the court denies the parties' cross-motions for summary judgment in their entirety.

Accordingly, it is hereby **ORDERED** that

(1)    Plaintiffs' Motion for Partial Summary Judgment [as to Liability], filed August 23, 2016, is **DENIED**;

(2)    Defendant's Cross-Motion for Summary Judgment, filed September

23, 2016, is **DENIED**; and,

(3)     On or before **March 21, 2017**, the parties shall **FILE** a **Joint Status Report**.  The status report shall state whether settlement is a feasible option in this case.  If settlement is not viable, the report shall set forth the parties' proposed agreed-upon schedule for the exchanges required by Appendix A, ¶ 13 and the filings required by ¶¶ 14 through 17.

/s/ Lynn J. Bush
LYNN J. BUSH
Senior Judge