# In the United States Court of Federal Claims

No. 11-857L
(Filed: October 31, 2018)

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

|  |  |
|---|---|
| **TRINCO INVESTMENT CO. AND** | \* |
| **KATHLEEN G. ROSE, TRUSTEE OF** | \* |
| **THE V. & M. ROSE - MARITAL TRUST,** | \* Subject Matter Jurisdiction; Fifth |
| | \* Amendment; Takings; Just Compensation |
| **Plaintiffs,** | \* Self-executing; Sovereign Immunity; |
| | \* Separation of Powers; Article I; Article |
| **v.** | \* III; Common Law; Public Rights; Jury |
| | \* Trial; Seventh Amendment; Federal |
| **THE UNITED STATES,** | \* Courts; Legislative Courts; Tucker Act |
| | \* |
| **Defendant.** | \* |
| | \* |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## ORDER AND OPINION

On October 11, 2017, the eve of the pre-trial conference, Plaintiffs filed a Motion to Transfer (Plaintiffs' "Motion") to the U.S. District Court for the Eastern District of California, pursuant to 28 U.S.C. § 1631 and Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"), alleging that the Court of Federal Claims lacks subject matter jurisdiction to hear Fifth Amendment Takings claims. *See* Pls.' Mot., ECF No. 137. In addition to requesting oral argument, Plaintiffs also seek a stay of proceedings and certification of appeal to the Federal Circuit in the event that this Court denies their Motion. Pls.' Mot. at 1. On October 12, 2017, the Court issued a stay of proceedings pending the Supreme Court's decision in *Oil States Energy Services, LLC v. Greene's Energy Group, LLC*, _____ U.S. _____, 138 S. Ct. 1365 (2018). After *Oil States* was decided, Plaintiffs filed a supplemental brief on May 18, 2018, addressing the relevance of that case to the issues raised in Plaintiffs' Motion. *See* Pls.' Suppl. Mem., ECF No. 145. On July 2, 2018, Defendant filed a response. Def.'s Resp., ECF No. 147. On July 20, 2018, Plaintiffs filed a reply. Pls.' Reply, ECF No. 148. This matter is now fully briefed and ripe for decision.

For the reasons set forth below, Plaintiffs' Motion to Transfer is hereby **DENIED**. Plaintiffs' request for oral argument is hereby **DENIED** as moot,[1] but, Plaintiffs' request for a stay of proceedings and certification of issues for appeal to the Federal Circuit are hereby **GRANTED**.

---

[1] The Court does not believe that oral arguments would aid in the resolution of these issues, as the parties' briefs adequately elucidate their respective positions.

## I.     FACTS AND PROCEDURAL HISTORY

This takings case arises out of efforts in California to combat the persistent wildfires that have devastated much of the northwest United States.  The Plaintiffs, collectively referred to as "TrinCo," possess interests in 5 properties, all consisting of between 524 and 714 timbered acres, located in and around the Shasta-Trinity National Forest in Trinity County, California.  On June 20, 2008, several wildfires, collectively referred to as the Iron Complex fires, ignited near Plaintiffs' properties during a summer of unprecedented fire activity aggravated by drought conditions, high winds, and lightning strikes.  As a result, several communities in the vicinity of Plaintiffs' properties were under mandatory evacuation orders.

Although the United States Forest Service ("the Forest Service") and the State of California worked in concert to manage these fires, the firefighters assigned to suppress these fires had limited resources and steep, rugged terrain to consider while implementing their strategies.  In order to preserve the maximum amount of property and private structures in the path of the fires, the Forest Service utilized indirect firefighting methods, which involved the setting of control fires ahead of the fire path to consume any unburned timber that might fuel the wildfire.  As a result, 1,782 acres of Plaintiffs' merchantable timber, valued at approximately $6.6 million, was destroyed.

On December 7, 2011, Plaintiffs filed suit in the Court of Federal Claims, seeking compensation pursuant to the Fifth Amendment of the U.S. Constitution, based on the Defendant's physical taking of Plaintiffs' merchantable timber through actions of the U.S. Forest Service.

## II.     DISCUSSION

In their Motion to Transfer, Plaintiffs argue that the U.S. Court of Federal Claims cannot constitutionally hear takings claims against the United States based on the Fifth Amendment.  Pls.' Mot. at 1.  They argue that such cases must be decided in an Article III court rather than in an Article I court, such as the Court of Federal Claims.  Hence, Plaintiffs move to transfer their case to the U.S. District Court for the Eastern District of California.  Pls.' Mot. at 1.

Plaintiffs argue that the takings clause of the Fifth Amendment is self-executing, by which it means not only that there is no need for Congress to pass legislation to create the right to just compensation for a governmental taking but also that the doctrine of sovereign immunity does not apply to it.  Therefore, the United States can be sued *ipso facto*, without regard to a waiver of its sovereign immunity.  Not only can the Government be sued without having waived its sovereign immunity, but it must be sued in an Article III court, because takings claims are actions based on common law.  Plaintiffs bolster their argument by declaring a takings case between a private plaintiff and the U.S. Government as concerning a private right rather than a public right, the latter being within the exclusive purview of Article III courts.  Finally, Plaintiffs argue that Fifth Amendment takings cases must be decided by a jury.

Defendant agrees that the takings clause is self-executing in that it creates a substantive right to just compensation where the government has taken property, but maintains, however, that it is not a waiver of sovereign immunity.  Instead, the right to sue the government, whether for a taking or otherwise, must come from an explicit act of Congress, and can be conditioned as Congress sees fit.  Moreover, Defendant argues that the right to bring suit for just compensation is a public right, which Congress can permissibly assign to non-Article III courts for resolution.  Finally, Defendant contends that as a condition to the government's waiver of sovereign immunity, there is no right to a jury trial in Fifth Amendment takings cases.

## A.      The Federal Judiciary

Article III, Section 1, of the U.S. Constitution vests the judicial power of the United states in "one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."  U.S. Const. art. III, § 1.  Thus, *all* federal courts, other than the Supreme Court, are creatures of Congressional legislation.  Congress need not establish any inferior courts at all, and it has plenary power over the extent of their jurisdiction.  *See United States v. Union Pac. R.R. Co.*, 98 U.S. 569, 602 (1878) ("The discretion . . . of Congress as to the number, the character, the territorial limits of the courts among which it shall distribute [the] judicial power, is unrestricted except as to the Supreme Court.").  Indeed, even the Supreme Court, which has original jurisdiction in certain matters, does not have unlimited jurisdiction in appellate matters, but only "with such Exceptions, and under such Regulations as the Congress shall make."  U.S. Const. art. III, § 2.  Therefore, putting aside the doctrine of sovereign immunity, Article III allows for the possibility that citizens could not sue the federal government for compensation for a taking even in an Article III court where Congress did not establish inferior courts, thus proving that the judiciary is "the least dangerous branch."  The Federalist No. 78 (Alexander Hamilton).

In addition to inferior courts established under Article III, Congress may establish courts under Article I.  *See Williams v. United States*, 289 U.S. 553 (1933).  These have been called "legislative courts."  Congress's power to create such courts is well-established, and even the Plaintiffs do not question it.  *See* Pls.' Mot. at 9.  The first such courts were territorial courts, but with the expansion of the bureaucratic state under President Franklin Roosevelt, agencies began to exercise judicial power in limited circumstances—and this development was sanctioned by the Supreme Court.  *See American Ins. Co. v. Canter*, 26 U.S. 511, 1 Pet. 511 (1828) (concluding Article III did not apply to territorial courts); *See also, Opp Cotton Mills v. Administrator of Wage and Hour Division of Department of Labor*, 312 U.S. 126, 144 (1941) ("The mandate of the Constitution, Art. 1, s 1, that all legislative powers granted 'shall be vested' in Congress has never been thought to preclude Congress from resorting to the aid of administrative officers or boards as fact-finding agencies . . . ."); *Morgan v. United States*, 304 U.S. 1, 22 (1938) ("The maintenance of proper standards on the part of administrative agencies in the performance of their quasijudicial functions is of the highest importance and in no way cripples or embarrasses the exercise of their appropriate authority.").

The predecessor of the Court of Federal Claims and the Court of Appeals for the Federal Circuit was the Court of Claims, which was thought to be—for most of its existence—a legislative court, that is, one established under Article I.  *Compare Ex Parte Bakelite Corp.*, 279

U.S. 438 (1929) (holding the Court of Claims was not an Article III Court), *and Williams v. United States*, 289 U.S. 553 (1933) (same), *with Glidden Co. v. Zdanok*, 370 U.S. 530, 584 (1962), *superseded by statute*, Federal Courts Improvement Act of 1982, Pub. L. No. 97-164, 96 Stat. 25.  In general, it dealt with money claims against the United States, and its decisions originally were recommendations to Congress.  Act of February 24, 1855, ch. 122, 10 Stat. 612; *Langford v. United States*, 101 U.S. 341, 344 (1879).  Court of Claims decisions were definitively accorded final judgement status in 1866.  Act of March 17, 1866, ch. 19, sec. 1, 14 Stat. 9.  The Court of Claims' jurisdiction was significantly expanded by the Tucker Act, Act of March 3, 1887, ch. 359, 24 Stat. 505, which articulated the court's jurisdiction over "claims founded upon the Constitution of the United States."  The Tucker Act, and later expansions of its jurisdiction, were understood to be waivers of sovereign immunity on the part of the U.S. government.  *See e.g.*, *Soriano v. United States*, 352 U.S. 270, 273 (1957); *United States v. Sherwood*, 312 U.S. 584, 590 (1941); *Belknap v. Schild*, 161 U.S. 10, 17 (1896); *Schillinger v. United States*, 155 U.S. 163, 166–67 (1894).  In 1982, the trial court functions of the Court of Claims became the work of the new United States Claims Court, later called the Court of Federal Claims, Federal Courts Administration Act of 1992, Pub. L. 102-572, Title IX, § 902, 106 Stat. 4506 (1992), and it was designated an Article I court.  Federal Courts Improvement Act of 1982, Pub. L. No. 97-164, 96 Stat. 25.  Thus, until the Tucker Act, compensation for takings by the federal government were a matter of private bills and, after 1855, Court of Claims recommendations.  Act of February 24, 1855, ch. 122, 10 Stat. 612; *see United States v. Mitchell*, 463 U.S. 206, 212–14 (1983).  From 1789 to 1887, no one felt that the takings clause of the Fifth Amendment automatically gave a citizen the right to sue in court, let alone in an Article III court. *See* 18 Cong. Rec. 2680 (Remarks of Rep. Bayne) ("The fact is that [the Tucker Act] is going to . . . give the people of the United States what every civilized nation of the world has already done—the right to go into the courts to seek redress against the government for their grievances."); *See also*, *Langford v. United States*, 101 U.S. 341 (1879).

### B.    Self-Executing

As alluded to before, Plaintiffs think that the designation of the takings clause as "self-executing" means that the Constitution gives citizens the right to sue the United States in an Article III court.  Again, this would be news to judges and legal scholars in the first one hundred years of this nation's existence under the present constitution.  Rather, this Court believes that "self-executing" means that no congressional legislation is necessary to make the United States subject to liability for just compensation to a property owner whose property is taken by it. *Jacobs v. United States*, 290 U.S. 13, 15 (1933) ("the right to recover just compensation for property taken by the United States . . . rested upon the Fifth Amendment.  Statutory recognition was not necessary.  A promise to pay was not necessary.  Such a promise was implied because of the duty to pay imposed by the amendment.").  If a property owner wishes to obtain compensation for such a taking, he or she must contend with the doctrine of sovereign immunity, which makes the United States immune to suit unless it consents to it.  Now, this seems rather like the famous "Catch 22": the owner has the right to compensation for a taking but the means to obtain it lie entirely in the hands of the taker.

That this cannot be the case is a natural reaction, and, indeed, it was the initial reaction of this Court, but the law supports this result.  *See Lynch v. United States*, 292 U.S. 571, 581 (1934)

4

("For consent to sue the United States is a privilege accorded, not the grant of a property right protected by the Fifth Amendment. The consent may be withdrawn, although given after much deliberation and for pecuniary consideration."). There is simply no precedent that the doctrine of sovereign immunity is waived by the mere fact of the presence of the takings clause in the Constitution. To the contrary, one can find statements that sovereign immunity is limitless and that it applies even to rights granted by the Constitution. *See Lynch*, 292 U.S. at 582 ("The sovereign's immunity from suit exists whatever the character of the proceeding or the source of the right sought to be enforced. It applies alike to causes of action arising under acts of Congress and to those arising from some violation of rights conferred upon the citizens by the Constitution.").

Furthermore, if a waiver of sovereign immunity were not necessary to sue the United States for compensation for a taking, Congress would be compelled *by the Constitution* to set up a court—or at least some kind of judicial tribunal—in the absence of the establishment of the inferior courts mentioned in Article III or of the provision of another judicial forum. This Court is not aware of any precedent that would give the Supreme Court jurisdiction over takings cases or permit it to force Congress to create a judicial tribunal for takings cases in order that the Fifth Amendment takings clause not be a dead letter. *See Webster v. Doe*, 486 U.S. 592, 613 (1988) (Scalia, J., dissenting) ("No one would suggest that, if Congress had not passed the Tucker Act, the courts would be able to order disbursements from the Treasury to pay for property taken under lawful authority . . . without just compensation.") (internal citation omitted)). This is perhaps why until 1855 there was no judicial forum for trying takings cases.

Of course, inferior courts under Article III do exist today—but so does the Court of Federal Claims. Even if the Constitution requires—and the United States could be compelled—to provide a means to determine that a taking has occurred and what is just compensation for it, why would Congress be prohibited from establishing a judicial forum under Article I?

## C.   Public v. Private Right

To counter this argument, Plaintiffs classify a taking case against the United States as a private right, which they say requires an Article III court. Pls.' Mot. at 7–10. But it is not clear that the public/private right distinction can serve as a definitive method of judging whether an Article III court is necessary. Furthermore, it is not clear that a lawsuit against the United States for compensation for a taking is a private right.

The lack of clarity in the Supreme Court's jurisprudence regarding the public/private right distinction was recently acknowledged: "This Court has not 'definitively explained' the distinction between public and private rights, *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 69 (1982), and its precedents applying the public-rights doctrine have 'not been entirely consistent,' *Stern*, 564 U.S., at 488." *Oil States Energy Servs., LLC v. Greene's Energy Group, LLC*, _____ U.S. _____, 138 S.Ct. 1365, 1373 (2018).

*Northern Pipeline* figures prominently in the Supreme Court's recent jurisprudence on the requirements of Article III. 458 U.S. 50 (1982). In that case, the Court, while admitting that the Supreme Court had not "definitively explained" the public/private rights distinction,

nevertheless firmly held that private rights demand an Article III court while public rights may be judged by an Article I tribunal:

> The distinction between public rights and private rights has not been definitively explained in our precedents. Nor is it necessary to do so in the present cases, for it suffices to observe that a matter of public rights must at a minimum arise "between the government and others." *Ex parte Bakelite Corp.*, *supra*, at 451, 49 S.Ct., at 413. In contrast, "the liability of one individual to another under the law as defined," *Crowell v. Benson*, *supra*, at 51, 52 S.Ct., at 292, is a matter of private rights. Our precedents clearly establish that only controversies in the former category may be removed from Art. III courts and delegated to legislative courts or administrative agencies for their determination.

458 U.S. 50, 69–70 (1982).

It seems that one might draw from this passage the lesson that, however undefined the whole universe of the public/private right distinction is, it may at least be said that public rights are ones between the government and others and that private rights are ones between one individual and another. *See Ex parte Bakelite Corp.*, 279 U.S. at 451; *Crowell*, 285 U.S. 22, 51; *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 174 (2011). Therefore, it is logical to conclude that since takings cases under the Fifth Amendment arise between the government and others, they involve public rights, not private ones. *See First English Evangelical Lutheran Church of Glendale v. Los Angeles County, Cal.*, 482 U.S. 304, 318–19 (1987) ("It is axiomatic that the Fifth Amendment's just compensation provision is 'designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'"). Indeed, the parties have cited no cases and this Court has not discovered in its research any case that holds that a claim against the United States is a private right. Consequently, Fifth Amendment takings disputes may be removed from Article III courts and delegated to legislative courts such as the Court of Federal Claims. It is important to note, however, that *Northern Pipeline* does not say that Article III courts *cannot* hear cases involving public rights. 458 U.S. 50, 70. It is just that they may be "removed" from Article III courts by act of Congress. *Id.*

However, this neat explanation of the difference between public and private rights and its ramifications regarding the competence of a non-Article III forum quickly breaks down upon further examination.

*Northern Pipeline* found violative of Article III the scope of a Bankruptcy Courts' adjudicative powers under the statute in force at the time. 458 U.S. at 87, *superseded by statute*, 28 U.S.C. § 157(b)(5). The Court's plurality opinion in *Northern Pipeline* focused on two cases, *Crowell* and *Murray's Lessee v. Hoboken Land & Improvement Co.,* 18 How. 272 (1856), in its discussion of the public/private right distinction. *Northern Pipeline*, 458 U.S. at 63–86. According to *Northern Pipeline*, the public rights doctrine was first set forth in *Murray's Lessee*:

> [W]e do not consider congress can either withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty; nor, on the other hand, can it bring under the judicial power a matter which, from its nature, is not a subject for judicial determination. At the same time there are matters, involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper.

*Id.* at 67. In *Murray's Lessee*, the U.S. Treasury used an extra-judicial process pursuant to an act passed by Congress to get back its money from a customs collector who had embezzled it. 59 U.S. 272, 274, 18 How. 272, 274. The Court held that it was not a violation of Article III for the government to use this process. *Id.* at 285–86.

*Crowell* involved a determination by an administrative agency in favor of one private party against another private party pursuant to a system of workers compensation for injury sustained on the navigable waters of the United States. 285 U.S. 22, 36–37. One of the bases on which the decision of the agency was attacked was that it was unconstitutionally exercising Article III judicial power. *Id.* at 49. The Court held that Congress could set up a system that allowed an agency to determine the claim without violating Article III, despite the fact that the case involved two private parties—and indeed, despite the fact that the Court labeled the issue as one of private right! *Id.* at 51 ("The present case . . . is one of private right, that is, of the liability of one individual to another under the law as defined.").[2]

The circumstances in which a dispute between private parties decided by a non-Article III tribunal would be constitutional were described in a plurality opinion of the Court in *Northern Pipeline.* 458 U.S. at 67–68. Quoting *Crowell*, the Court stated:

> The [public rights] doctrine extends only to matters arising "between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments," *Crowell v. Benson*, 285 U.S. 22, 50, 52 S.Ct. 285, 292, 76 L.Ed. 598 (1932), and only to matters that historically could have been determined exclusively by those departments.

*Id.*

But, the reasoning of the plurality in *Northern Pipeline* has been questioned in subsequent Supreme Court decisions. In *Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568 (1985), for example, the Court stated:

---

[2] It is interesting that the case involved admiralty law, which is part of the judicial power of the United States according to Article III. *See* U.S. Const. art. III, § 2.

> This theory that the public rights/private rights dichotomy of *Crowell* and *Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 How. 272 (1856), provides a bright-line test for determining the requirements of Article III did not command a majority of the Court in *Northern Pipeline*. Insofar as appellees interpret that case and *Crowell* as establishing that the right to an Article III forum is absolute unless the Federal Government is a party of record, we cannot agree. *Cf. Northern Pipeline Construction Co.*, 458 U.S., at 71 (plurality opinion) (noting that discharge in bankruptcy, which adjusts liabilities between individuals, is arguably a public right). *But see id.*, at 69, n. 23. Nor did a majority of the Court endorse the implication of the private right/public right dichotomy that Article III has no force simply because a dispute is between the Government and an individual. *Compare id.*, at 68, n. 20, *with id.*, at 70, n. 23.

*Thomas*, 473 U.S. at 585–86. Thus, the *Thomas* Court rejects the proposition that where the federal government is not a party to the suit the case must be decided in an Article III court, and it does not feel bound by the principle that where a suit is between the federal government and an individual Article III does not apply. *See id.* at 587–89.

In fact, the Court in *Thomas* goes farther in concluding that the public/private right distinction does not provide a definitive method of judging whether an Article III court is necessary in a given case, and, indeed, sees the distinction as a "formalistic or abstract Article III inquiry," *id.* at 586, that is opposed to the reasoning in *Crowell*! *Compare Thomas*, 473 U.S. at 586–87, *with Crowell*, 285 U.S. at 50–51. *Thomas* notes (as this Court has done) that "[a]lthough [the] findings [of the federal official in *Crowell*] clearly concern obligations among private parties, this fact did not make the scheme invalid under Article III." *Thomas*, 473 U.S. at 586–87. Thus, "[t]he enduring lesson of *Crowell* is that practical attention to substance rather than doctrinaire reliance on formal categories should inform application of Article III." *Id.* at 587. In conclusion, the Court opines that "[i]n essence, the public rights doctrine reflects simply a pragmatic understanding that when Congress selects a quasi-judicial method of resolving matters that 'could be conclusively determined by the Executive and Legislative Branches,' the danger of encroaching on the judicial powers is reduced." *Id.* at 589.

The context of *Thomas* was a provision of the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") that provided for binding arbitration regarding the obligation of a later registrant of a pesticide with the Environmental Protection Agency to compensate a prior registrant when the later registrant uses the data submitted by the prior registrant, as is permitted by FIFRA. *See id.* at 571. Thus, the context was one of a regulatory scheme administered by an agency. The Court held that the binding arbitration provision did not violate Article III. *Id.* at 594.

For the *Thomas* Court, the bottom line is this: "The Court's holding in [*Northern Pipeline*] establishes only that Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review." *Id.* at 584.

We return to the bankruptcy context with *Stern v. Marshall*, 564 U.S. 462 (2011), this time under a different statute than the one in force in *Northern Pipeline*. *Compare Stern*, 564 U.S. 462 (applying 28 U.S.C. § 157), *with Northern Pipeline*, 458 U.S. 50 (1982) (applying Bankruptcy Act of 1978, 28 U.S.C. § 1471, Pub. L. 95-598 (effective Oct. 1, 1979)). In holding that "[t]he Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim," *Stern*, 564 U.S. at 503, the Court had recourse to the public/private right distinction (also now characterized as "the public right exception"—presumably because it believes that otherwise the judicial power of the United States resides exclusively in Article III courts), despite admitting that "our discussion of the public rights exception . . . has not been entirely consistent, and the exception has been the subject of some debate." *Id.* at 488.

Thus, the majority opinion uses the public right exception as an analytical tool only to ascertain whether the case before it "fall[s] within any of the various formulations of the concept that appear in [the Supreme] Court's opinions." *Id.* In examining these formulations, the Court has recourse to the (now familiar) case of *Murray's Lessee*, but in its discussion of this case, the Court makes a novel connection—between the public right exception and sovereign immunity:

> The challenge in *Murray's Lessee* to the Treasury Department's sale of the collector's land likewise fell within the "public rights" category of cases, *because it could only be brought if the Federal Government chose to allow it by waiving sovereign immunity*. The point of *Murray's Lessee* was simply that Congress may set the terms of adjudicating a suit when the suit could not otherwise proceed at all.

*Stern*, 564 U.S. at 489 (emphasis added). The purport of the emphasized language is that—at least for *Murray's Lessee*—the doctrine of sovereign immunity and the public right exception overlap. Consequently, if the federal government would have to waive sovereign immunity to allow the suit, the suit would be one of public right, in which case the government could establish a non-Article III tribunal to decide it.

The *Stern* Court's review of the various formulations of the public right exception to see if they apply to the circumstances in the case before it does not yield any new insights except insofar as the Court distinguishes public right exception cases that involve administrative agencies from those which involve courts. *See id.* at 488–95, 494 ("Given the extent to which this case is so markedly distinct from the agency cases discussing the public rights exception in the context of [a substantive regulatory scheme], however, we do not in this opinion express any view on how the doctrine might apply in that different context."). The Court admits that the public/private right distinction "fails to provide concrete guidance as to whether, for example, a particular agency can adjudicate legal issues under a substantive regulatory scheme," *id.* at 494, but "[w]hat is plain here is that this case involves the most prototypical exercise of judicial power: the entry of a final, binding judgment *by a court* with broad substantive jurisdiction, on a common law cause of action, when the action neither derives from nor depends upon any agency regulatory regime." *Id.* (emphasis in original).

From the above discussion, this Court is convinced that the Supreme Court has no precise notion of the public/private right distinction. The distinction is a useful but inconclusive analytical tool. In the administrative agency context, the *Thomas* Court sees in Supreme Court precedent the rule that "practical attention to substance rather than doctrinaire reliance on formal categories should inform application of Article III." *Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 587 (1985). In a judicial context, the later *Stern* case, while expressing reservations about the "public right exception," nevertheless, searches the Court's various formulations of the public right exception to shed light on the question before it. *Stern*, 564 U.S. at 488–95. In addition, it seems to see in waiver of sovereign immunity an indication of a public right. *See id.* at 489. It seems also to caution against applying the rationale of administrative agency cases to cases in which an actual court is involved. *Id.* at 493–94. But, in the end, this Court feels that the result in *Stern* was based on the fact that the case was between private parties and on the fact that the Bankruptcy Court was exercising jurisdiction over a traditionally common law cause of action. *See id.* at 503 ("Congress, in one isolated respect, exceeded [the limitation of Article III] in the Bankruptcy Act of 1984. The Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim.").

The case before this Court fits the classic definition of public right in that it is a dispute between the government and an individual, not between private parties. This Court has already stated that it is not aware of any cases in which the Supreme Court has held that a dispute between the federal government and another is a private right. *See supra.* Indeed, *Stern* hints that disputes between the government and another always involve a public right. *Stern*, 564 U.S. at 490 ("Shortly after *Northern Pipeline,* the Court rejected the limitation of the public rights exception to actions involving the Government as a party."). None of the cases discussed above were between the United States and another party. *See Murray's Lessee v. Hoboken Land & Improvement Co.,* 59 U.S. 272, 18 How. 272 (1856) (private individuals); *Crowell v. Benson*, 285 U.S. 22 (1932) (private individuals); *Thomas*, 473 U.S. 568 (1985) (pesticide manufacturers); *Northern Pipeline*, 458 U.S. 50 (1982) (corporations); *Stern*, 564 U.S. 462 (2011) (private individuals). It is only when the Supreme Court wishes to conclude, in a private versus private context, that the use of a non-Article III forum does not violate Article III does it tie itself up in knots regarding the application of the public/private distinction. Indeed, this Court feels that, as a rule of thumb, the use of a non-Article III forum to adjudicate disputes between the government and another is consistent with Article III. The *Stern* Court's interpretation of *Murray's Lessee* supports this conclusion by recognizing the overlap between waiver of sovereign immunity and the ascertainment of a public right. *See Stern*, 564 U.S. at 489.

The conclusion that a dispute between the government and another is ordinarily a matter of a public right does not mean that such a dispute cannot be confided by Congress to an Article III court, just that it need not be. Among many examples, the Little Tucker Act is most pertinent. *See* 28 U.S.C. § 1346. To be sure, the *Thomas* court noted that a majority of the Court in *Northern Pipeline* did not "endorse the implication of the private right/public right dichotomy that Article III has no force simply because a dispute is between the Government and an individual." *Thomas*, 564 U.S. at 586. This statement, of course, is about something the Court did *not* do; it is not authority for the proposition that the Supreme Court has held that Article III has force in a dispute between the government and another. In light of *Stern's* reading of

*Murray's Lessee,* it may very well be that it is simply not violative of Article III for a non-Article III forum to adjudicate a dispute between the government and another, this being a corollary of the doctrine of sovereign immunity.

### D.  A Takings Case Is Not a Common Law Cause of Action

Plaintiffs argue that, since takings cases are common law causes of action, they must be heard in an Article III court.  Pls.' Mot. at 6–7.  As authority for this proposition, they cite *Stern*. *See id.* at 6.  But this citation to *Stern* is actually a citation to *Murray's Lessee,* and Plaintiffs' quotation leaves out a crucial phrase.  In quoting from *Murray's Lessee,* the Court stated: "[W]e have long recognized that, *in general,* Congress may not 'withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty.'" *Stern,* 564 U.S. at 484 (emphasis added).  With good reason the *Stern* Court used "in general," because in *Murray's Lessee,* what follows the phrase quoted in *Stern,* is: "*At the same time* there are matters, involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper." *Murray's Lessee,* 59 U.S. at 284 (emphasis added). Thus, the quotation presented to this Court in support of the proposition that common law causes of action must be heard by Article III courts is, in fact, qualified by the next sentence.  To be sure, the second sentence may be denoting public rights cases as ones not at common law, but this interpretation does not account for the phrase "at the same time" nor does it account for the *Stern* Court's use of "in general," which clearly implies that some common law cases need not be heard by Article III courts.  Thus, the quotation from *Stern* does not support Plaintiffs' proposition; indeed, it seems to indicate that some common law causes of action *may* be heard by non-Article III courts.  This is, of course, true of territorial courts.  *See e.g.*, *Simms v. Simms*, 175 U.S. 162 (1899); *Foley v. Harrison*, 56 U.S. 433, 15 How. 433 (1854); *Burgess v. Gray*, 57 U.S. 48, 16 How. 48 (1854); *American Ins. Co. v. Canter*, 26 U.S. 511, 1 Pet. 511 (1828).[3]

But, even if *arguendo* a non-Article III court cannot hear common law cases, is a takings case one at common law?  Plaintiffs distinguish eminent domain from inverse condemnation, the former being the taking of property through a formal judicial proceeding, the latter being a de facto condemnation.

Regarding eminent domain proceedings, Plaintiffs cite *Kohl v. United States*, 91 U.S. 367 (1876): "[t]he right of eminent domain always was a right at common law." Pls.' Mot. at 6 (quoting *Kohl*, 91 U.S. at 376).  But the context of this statement considerably weakens its significance regarding the general question of whether a non-Article III court can hear a takings case, and, in any event, the Court of Federal Claims does not hear eminent domain cases.

---

[3] Giving Bankruptcy Courts the power to decide "a common law cause of action" does seem to have been crucial to the *Stern* Court's holding that Congress had violated Article III, but it may have been equally crucial to the Court that the case was between private parties. *See Stern*, 564 U.S. at 493, 495, 499-500, 503.

*Kohl* was actually about whether an *Article III* court could hear an eminent domain case! The United States had brought an action for the condemnation of property in Cincinnati as a site for a post office.  As the *plaintiff* was the federal government, the defendant appealed to the Supreme Court from an adverse ruling in the U.S. Circuit Court.  Defendant argued: "For upwards of eighty years, no act of Congress was passed for the exercise of the right of eminent domain in the States, or for acquiring property for Federal purposes otherwise than by purchase, or by appropriation under the authority of State laws in State tribunals."  *Kohl*, 91 U.S. at 369. Congress had not expressly given the Circuit Courts jurisdiction over eminent domain cases. Nevertheless, the Supreme Court held that the Circuit Courts of the United States had the power to hear condemnation cases: "The Judiciary Act of 1789 conferred upon the circuit courts of the United States jurisdiction of all suits at common law or in equity, when the United States, or any officer thereof, suing under the authority of any act of Congress, are *plaintiffs*."  *Id.* at 375 (emphasis added).  It was in this context that the Court found that "[t]he right of eminent domain always was a right at common law."  *Id.* at 376.  But (ironically for the Plaintiffs) the Court also said that Congress could have made other provisions for the exercise of eminent domain by the federal government:

> Doubtless Congress might have provided a mode of taking the land, and determining the compensation to be made, which would have been exclusive of all other modes.  They might have prescribed in what tribunal or by what agents the taking and the ascertainment of the just compensation should be accomplished. The mode might have been by a *commission*, or it might have been referred expressly to the Circuit Court; but this, we think, was not necessary.

*Id.* at 375 (emphasis added).  Thus, the *Kohl* case stands for the proposition that, although eminent domain proceedings were actions at common law, Congress may have provided a non-Article III forum to hear them.

Turning to inverse condemnation, Plaintiffs quote from *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687 (1999), that as "a matter of historical practice . . . suits to recover just compensation [for government takings] have been framed as common law tort actions."  Pls.' Mot. at 6 (quoting *City of Monterey*, 526 U.S. at 715–16).  Now, while Plaintiffs are precise enough to point out that this statement is in a plurality opinion, they are not precise enough to quote the whole sentence (as Defendant points out) that puts a different spin on the subject.  The whole sentence reads: "as a matter of historical practice, *when the government has taken property without providing an adequate means for obtaining redress*, suits to recover just compensation have been framed as common law tort actions."  *City of Monterey*, 526 U.S. at 715 (emphasis added).  The omitted part, which is in italics, speaks for itself and obviously weakens Plaintiffs' point, as the government has provided "an adequate means for obtaining redress," namely, the Court of Federal Claims.  *See id.*

Aside from being a plurality opinion—and a case not involving the U.S. government— the case is so convoluted that it really doesn't pack the punch for the Plaintiffs' broad assertion that takings claims are common law causes of action that must be heard by Article III courts.  In *Monterey*, a property owner brought a section 1983 action against the city, alleging that the city's

repeated rejections of the owner's proposals for the development of its property had violated the owner's equal protection and due process rights, and had effected a regulatory taking. *Id.* at 694. The essence of the case, however, was whether the Seventh Amendment required a jury trial for the section 1983 action. As the section 1983 action included an allegation of taking without just compensation, this allegation figured into the Court's Seventh Amendment analysis.

Regarding the requirement of a jury, the Court noted that Congress did not provide that section 1983 actions be tried by a jury, and the Court had already laid down a rule that "the Seventh Amendment jury guarantee extends to statutory claims unknown to the common law, so long as the claims can be said to 'soun[d] basically in tort.'" *Id.* at 709. The Court noted that:

> [A]t the time of the city's actions, the State of California did not provide a compensatory remedy for temporary regulatory takings. The constitutional injury alleged, therefore, is not that property was taken but that it was taken without just compensation. Had the city paid for the property or had an adequate postdeprivation remedy been available, Del Monte Dunes would have suffered no constitutional injury from the taking alone. Because its statutory action did not accrue until it was denied just compensation, in a strict sense Del Monte Dunes sought not just compensation *per se* but rather damages for the unconstitutional denial of such compensation. Damages for a constitutional violation are a legal remedy.

*Id.* at 710.

It is worth noting that the Court rejected the City's argument that the Court should look to the "underlying constitutional right asserted." *Id.* at 711. There is a very short discussion of the Fifth Amendment in the opinion. The Court mentions that sovereign immunity does not apply to the City of Monterey, *id.* at 714, and it focuses again on the problem of the lack of a forum in inverse condemnation cases: "Even when the government takes property without initiating condemnation proceedings, there is no constitutional violation 'unless or until the state fails to provide an adequate postdeprivation remedy for the property loss.'" *Id.* at 714–15 (internal citations omitted). History, says the Court, supports the holding that a section 1983 case is one at common law: "Early opinions, nearly contemporaneous with the adoption of the Bill of Rights, suggested that when the government took property *but failed to provide a means for obtaining just compensation*, an action to recover damages for the government's actions would sound in tort." *Id.* at 715 (emphasis added).

Fifth Amendment takings come up again in the opinion in the context of the jury trial requirement issue:

> Although this Court has decided many regulatory takings cases, none of our decisions has addressed the proper allocation of liability determinations between judge and jury in explicit terms. This is not surprising. Most of our regulatory takings decisions have reviewed suits against the United States or suits seeking only injunctive relief. It is settled law that the Seventh Amendment does not apply in these contexts.

*Id.* at 719 (internal citations omitted).

Justice Scalia's concurring opinion articulates the question presented to the Court simply and accurately: "The question before us, therefore, is not what common-law action is most analogous to some generic suit seeking compensation for a Fifth Amendment taking, but what common-law action is most analogous *to a § 1983 claim*." *Id.* at 724 (Scalia, J., concurring) (emphasis in the original).

Clearly, then, the Court in *Monterey* did not focus on whether a takings case against the federal government is a common law cause of action. In fact, it concentrated on the lack of a just compensation remedy in the case before it, and alluded to the fact that its holding had no effect on Fifth Amendment takings claims against the federal government. *See id.* at 721–22.

Finally, this Court wishes to mention one other case pertinent to the question of classifying a takings claim against the federal government as a common law cause of action. Defendant points to *McElrath v. United States*, 102 U.S. 426, 440 (1880), in its argument that the Seventh Amendment does not require jury trials for suits for just compensation under the Fifth Amendment. *See* Def.'s Response at 20–21. Plaintiffs ignore this case. True, this case did not involve a takings case as such; instead, it involved a claim for military pay. *See McElrath*, 102 U.S. at 435–36. Because the government had filed a counterclaim, the plaintiff had challenged the power of the Court of Claims to decide this case without a jury, arguing that it was a common law cause of action in excess of $20 for which the Seventh Amendment requires a jury trial. But the Court expatiated on the jurisdiction of the Court of Claims and the question of common law causes of action before it:

> Suits against the government in the Court of Claims, whether reference be had to the claimant's demand, or to the defence (sic), or to any set-off, or counter-claim which the government may assert, are not controlled by the Seventh Amendment. *They are not suits at common law within its true meaning*. The government cannot be sued, except with its own consent. It can declare in what court it may be sued, and prescribe the forms of pleading and the rules of practice to be observed in such suits.

*Id.* at 440 (emphasis added).

Now, it may be argued that the Court here is talking only about military pay cases when it says "[s]uits against the government," but such an interpretation is crabbed. The Court seems to be talking about suits against the government in the Court of Claims in general, and this interpretation is supported by the explanation that immediately follows the declaration that such suits are not "suits at common law within its true meaning," namely, that "[t]he government cannot be sued, except with its own consent." *Id.* In other words, cases before the Court of Claims were not really common law causes of action because they could be precluded by sovereign immunity.

## E.      Cases Discussing Article I/Article III Courts

The three most important Supreme Court cases that actually discuss Article I and Article III courts (outside the bankruptcy context) are: *Ex parte Bakelite Corp.*, 279 U.S. 438 (1929); *Williams v. United States*, 289 U.S. 553 (1933); and *Glidden Co. v. Zdanok*, 370 U.S. 530 (1962) (plurality opinion).

In *Bakelite*, the question before the Court was whether the Court of Customs Appeals was an Article III or an Article I court.  279 U.S. at 448.  The opinion, however, on the way to concluding that the Court of Customs Appeals was an Article I court, has a lengthy discussion of the Court of Claims, the predecessor of the Court of Federal Claims.  *See id.* at 451–55.  It makes several important points.

First, in its description of "legislative courts" it characterizes them as courts addressing cases between "the government and others."  *Id.* at 451.

Second, in discussing claims against the United States, *Bakelite* specifically mentions claims involving "lands," and it places legislative courts in the context of sovereign immunity.  It is worth quoting the passage in full:

> [Claims against the United States] may arise in many ways and may be for money, lands, or other things.  They all admit of legislative or executive determination, and yet from their nature are susceptible of determination by courts; but no court can have cognizance of them except as Congress makes specific provision therefor.  Nor do claimants have any right to sue on them unless Congress consents; and Congress may attach to its consent such conditions as it deems proper, even to requiring that the suits be brought in a legislative court specially created to consider them.

*Id.* at 452.

Third, *Bakelite* relates the Court of Claims to Congress's power to pay debts.

> The Court of Claims is such a court.  It was created, and has been maintained, as a special tribunal to examine and determine claims for money against the United States.  This is a function which belongs primarily to Congress as an incident of its power to pay the debts of the United States.  But the function is one which Congress has a discretion either to exercise directly or to delegate to other agencies.

*Id.*

Finally, *Bakelite* notes that legislative courts, although established under Article I, may be called courts of the United States.  Speaking specifically of the Court of Customs Appeals, the Court in *Bakelite* said: "Another feature to which attention was given is the denomination of the court as a United States court.  That the court is a court of the United States is plain; but this is quite consistent with its being a legislative court."  *Id.* at 460.

In *Williams*, the question whether the Court of Claims was an Article I or an Article III court was squarely presented. 289 U.S. 553, 561 (1933). The context was the legality of the diminution in compensation of a Court of Claims judge that had been voted by Congress. The Court held that the Court of Claims was a legislative court not a constitutional court established under Article III; therefore, the judge's salary could be reduced. *Id.* at 581. At the time of the decision, the Court of Claims was enabled by Congress to decide takings cases against the federal government. *See* Act of March 3, 1887, ch. 359, 24 Stat. 505 (granting the Court of Claims jurisdiction over "claims founded upon the Constitution of the United States").

The *Williams* opinion explained why the Court of Claims was not an Article III court despite the fact that Article III extends the judicial power of the United States to "Controversies to which the United States shall be a Party." *See id.* at 567–81. For purposes of this Motion, two parts of the Court's explanation are important: (1) sovereign immunity and (2) separation of powers.

The Court agreed that, on its face, this clause includes cases against the United States, but it concluded that the doctrine of sovereign immunity withdrew these cases from its ambit: "[I]n the light of the rule, then well settled and understood, that the sovereign power is immune from suit, the conclusion is inadmissible that the framers of the Constitution intended to include [in the doctrine of sovereign immunity] suits or actions brought against the United States." *Id.* at 573. Further, the Court cites the words of Chief Justice Marshall: "And in *Cohens v. Virginia*, *supra*, at pages 411—412 of 6 Wheat., 5 L.Ed. 257, Chief Justice Marshall said: 'The universally received opinion is, that no suit can be commenced or prosecuted against the United States; that the judiciary act does not authorize such suits.'" *Id.* at 574. Finally, the Court's construction is as follows:

> That clause must be construed, in accordance with the practical construction put upon it by the first Judiciary Act, as though it read, 'controversies to which the United States shall be a party plaintiff or petitioner;' and, thus read, controversies to which the United States may by statute be made a party defendant, at least as a general rule, lie wholly outside the scope of the judicial power vested by article 3 in the constitutional courts.

*Id.* at 577.

The doctrine of separation of powers comes into play to counter the argument that once the Unites States consents to be sued, Article III attaches to the court. The Court stated:

> [This argument] cannot be reconciled with the limitation fundamentally implicit in the constitutional separation of the powers, namely, that a power definitely assigned by the Constitution to one department can neither be surrendered nor delegated by that department, nor vested by statute in another department or agency.

*Id.* at 578.  This turns on its head any contention that separation of powers requires that takings cases against the federal government must be heard in Article III courts.

It is clear from the above, that the Supreme Court considered the Court of Claims to be an Article I court, and there is not a hint of a problem with it hearing takings cases against the federal government.  In these cases, we see again the foundation of the court being the waiver of sovereign immunity.  *See Bakelite*, 279 U.S. at 452; *Williams*, 289 U.S. at 562–64.

In 1953, Congress enacted a law that declared the Court of Claims and the Court of Customs and Patent Appeals to be Article III courts.  Act of July 28, 1953, ch. 253, § 1, 67 Stat. 226.  *Glidden* arose, not because of a challenge to this declaration, but because one Court of Claims judge and one judge of the Court of Customs and Patent Appeals had sat by designation in an Article III court before the 1953 declaration.  *Glidden v. Zdanok*, 370 U.S. 530, 531–33.  Each of the judges, unlike the Court of Federal Claims today, were protected in their tenure and compensation like Article III judges, from the time of the court's inception.  *Id.* at 533 & n.5; *See* Act of February 24, 1855, 10 Stat. 612 (1855); Act of June 25, 1948, Pub. L. 80-773, ch. 646, 62 Stat. 898 (1948).  The *Glidden* Court found that this protection depended on the constitutional status of the courts to which they were appointed, 370 U.S. at 540–41; therefore, this protection was an indication that the Court of Claims was an Article III court.  In holding that the Court of Claims was, since the congressional declaration and seemingly from its inception (or at least when it got final judgment authority) an Article III court,[4] the *Glidden* court swept aside the discussion in *Bakelite*, the holding in *Williams* and the fact that the court continued to hear congressional reference cases, thereby rendering advisory opinions.

Justice Clark's dissent in *Glidden* accused the majority of overruling *Bakelite* and Williams,[5] but these cases seem to live on at least in the cogency of some of their analyses if not in their results.  *See e.g., Oil States Energy Servs., LLC v. Greene's Energy Group*, _____ U.S. _____, 138 S.Ct. 1365 (2018); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989); *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982).  For example, in a very recent case dealing with the Patent Trial and Appeal Board's (an Article I tribunal) power to cancel an existing patent, *Oil States*, the Court cited *Bakelite* and *Williams* approvingly.  _____ U.S. _____, 138 S.Ct. 1365, 1373–74, 1378 (2018).  Indeed, recourse was had to *Bakelite* for an understanding of the public/private right distinction.  *See id.* at 1378.  *Oil States* held that the Board could hear reconsiderations of the Patent and Trademark Office's patent grants and that it could cancel existing patents.  *Id.* at 1377–79.  Neither party in the present litigation considers this holding to be particularly helpful deciding the question presented here.  *See* Pls.' Suppl.

---

[4] "Since the Court of Claims and the Court of Customs and Patent Appeals are courts created under Article III, their judges—including retired judges—*are and have been* constitutionally protected in tenure and compensation."  *Id.* at 584 (emphasis added).

[5] "I cannot agree to the unnecessary overruling of *Ex parte Bakelite Corp.*, 279 U.S. 438, 49 S.Ct. 411, 73 L.Ed. 789 (1929), and *Williams v. United States*, 289 U.S. 553, 53 S.Ct. 751, 77 L.Ed. 1372 (1933).  Both were unanimous opinions by most distinguished Courts, headed in the Bakelite case by Chief Justice Taft and in Williams by Chief Justice Hughes."  *Id.* at 585 (Clark, J., dissenting).

Mem. at 1, 3–4; Def.'s Resp. at 23–24; Pls.' Reply at 18.  Nevertheless, this Court points out a few interesting points in the opinion: (1) the invocation of the public/private right distinction, (2) the use of *Bakelite* and *Williams*, and (3) the examination of English law at the time of the Framers.  *Oil States*, _____ U.S. _____, 138 S.Ct. at 1373–74, 1376–78.  Regarding (3), this Court notes that the Supreme Court found that challenging patents was a matter for the courts and for the government.  *Id.* at 1377–78.

Two recent Circuit Court cases, however, deal squarely with the authority of the Court of Federal Claims to hear and decide takings cases against the federal government.  *Brott v. United States*, 858 F.3d 425 (6th Cir. 2017), *cert denied*, _____ U.S. _____, 138 S.Ct. 1324 (2018), involved the taking of land, and *Sammons v. United* States, 860 F.3d 296 (5th Cir. 2017), *cert denied*, _____ U.S. _____, 138 S.Ct. 1325 (2018), involved a regulatory taking of shares.  In both cases the court held that the Court of Federal Claims had constitutional power to decide these issues.  *Brott*, 858 F.3d at 437; *Sammons*, 860 F.3d at 300.

In *Brott*, the 6th Circuit found that, although the Fifth Amendment provided the remedy of just compensation, sovereign immunity allowed the United States to decide the forum in which the remedy might be sought.  858 F.3d at 432–36.  It found that the Fifth Amendment is self-executing only insofar as no act of Congress is necessary for the federal government to be liable for compensation for a taking.  *Id.* at 432–33.  And it found that the doctrine of sovereign immunity applies to constitutional rights.  *Id.* at 432 (quoting *Webster v. Doe*, 486 U.S. 592, 613 (1988) (Scalia, J., dissenting)).  Finally, the Court found that plaintiff's claim was a matter of public right:

> The landowners' compensation claims are public-right claims.  These are claims made by private individuals against the government in connection with the performance of a historical and constitutional function of the legislative branch, namely, the control and payment of money from the treasury.  Indeed, the Court of Claims, the predecessor to the Court of Federal Claims, derived its power from the "Congressional power 'to pay the debts of the United States', which it is free to exercise through judicial as well as non-judicial agencies."  *Sherwood*, 312 U.S. at 587, 61 S.Ct. 767 (quoting U.S. Const. art. 1, § 8, cl. 1); *see Bakelite*, 279 U.S. at 452, 49 S.Ct. 411.  Therefore, Congress may delegate the landowners' just-compensation claims to a legislative court—the Court of Federal Claims—for resolution.

*Brott*, 858 F.3d at 435 (internal quotation omitted).

In arriving at its decision in *Brott*, the 6th Circuit discussed *Monongahela Navigation Co. v. United States*, 148 U.S. 312 (1893).  858 F.3d at 435–36.  Since Plaintiffs in this case place great store by this decision, this Court would like to comment on it.  *See* Pls.' Mot. at 8–10; Pls.' Reply at 6–8, 19.  This case involved condemnation of a lock and dam on the Monongahela River.  *Monongahela*, 148 U.S. at 324.  By means of private legislation, Congress provided that a component of the value of the lock and dam, namely, the franchise to collect tolls, should not be included in the compensation paid the owner.  *See* Act of August 11, 1888, 25 Stat. 411.  The federal court that heard the condemnation case valued the property taken without taking into

consideration the toll franchise, as Congress had ordered. *Monongahela*, 148 U.S. at 314 (Statement of Brewer, J.). The owner argued that it had not received "just" compensation. The Supreme Court agreed with the owner and ordered that the value of the franchise be included in the determination of the owner's compensation. *Id.* at 344–45. *Brott* found *Monongahela* to be inapposite because that case involved only an Article III court, and it went on to say that judicial review would satisfy the requirement of judicial determination. *Brott*, 858 F.3d. at 435–36.

*Monongahela* did not mention—let alone discuss—the extent of the judicial power of the United States under Article III versus Congress's ability to create courts under Article I. *Monongahela* merely held that just compensation was a judicial question that cannot be determined by legislation: "By this legislation congress seems to have assumed the right to determine what shall be the measure of compensation. But this is a judicial, and not a legislative, question." 148 U.S. at 327. In other words, Congress cannot by legislation limit the compensation justly due the owner. This is a far cry from Plaintiffs' interpretation of this passage, namely, that the question of just compensation cannot be confided to an Article I court that Congress has established with final judgment power. *See* Pls.' Mot. at 6–8; Pls.' Reply at 6–8.

In *Sammons*, one panel of the 5th Circuit felt bound by another panel of the circuit, which decided, in *Ware v. United States,* 626 F.2d 1278, 1279–80 (5th Cir. 1980), that sovereign immunity prevented it from entertaining a pendent claim for a taking over $10,000. 860 F.3d 296, 300. *Sammons*, however, did make a few pertinent observations: (1) the self-executing character of the Fifth Amendment takings clause did not mean that the United States had automatically waived sovereign immunity, *id.*, and (2) a claim against the United States for a taking under the Fifth Amendment was a matter of a public right that Congress could confide to a non-Article III court. *Id.*

Plaintiffs, of course, believe that these cases were wrongly decided. *See* Pls.' Mot. at 12–13. However, their reasons for so concluding are singularly weak: (1) the *Brott* court failed to take into consideration the arguments of the amici, and (2) the *Sammons* court relied on *Ware*, which was decided when the Court of Claims was an Article III court. Pls.' Mot. at 12–13. The court's reasoning in *Ware*, however, had nothing to do with the status of the Court of Claims. 626 F.2d 1278, 1285–87. The *Ware* decision was based on an analysis of the doctrine of sovereign immunity. It found that the United States must waive sovereign immunity for a claim to be heard—either in an Article III court or a non-Article III court. *Id.* at 1286. The holding in *Ware* was simply that the United States had only waived sovereign immunity for U.S. district courts for takings of $10,000 or less, that waivers of sovereign immunity must be strictly construed, that Congress had waived sovereign immunity to vest the Court of Claims with the power to decide claims of takings over $10,000, and that the doctrine of pendent jurisdiction cannot overcome sovereign immunity. *Id.* at 1286–87. This logic appears unassailable.

Finally, although the Federal Circuit has not squarely dealt with the issue of the constitutionality of the Court of Federal Claims jurisdiction over takings claims against the federal government, this Court looks to *MCM Portfolio LLC v. Hewlitt-Packard Co.*, 812 F.3d 1284 (Fed. Cir. 2015), to see if the Federal Circuit has provided some guidance on the Article I/Article III court distinction. This case dealt with whether a Patent Trial and Appeals Board's

decision to revoke a patent in an *inter partes* review provided for by statute violated Article III and the Seventh Amendment. The court held that it did not. *Id.* at 1292–93.

In arriving at its decision, the court recurred to the now-familiar public/private distinction. *See id.* at 1289–93. As this case involved a government agency (the Patent and Trademark Office ("PTO")) the court paid particular attention to those Supreme Court cases that found a matter of public right even in a dispute between private individuals: "The public rights exception was first applied to disputes between the government and private parties, as in *Murray's Lessee.* More recently, the Court has extended the doctrine to disputes between private parties concerning public rights." *Id.* at 1289. The court found *inter partes* review to be "indistinguishable" from cases such as *Thomas v. Union Carbide* and "wholly distinguishable" from the state law claims decided by bankruptcy courts in *Stern. Id.* at 1290. As Congress created patent rights and delegated patent grants to the PTO, the determination of these rights was a public right because it was a right "integrally related to particular federal government action." *Id.* (quoting *Stern v. Marshall*, 564 U.S. 462, 490–91 (2011)). As to the significance of the court's reasoning in *MCM* to the issue of takings claims adjudicated by an Article I court, it can at least be said that the Federal Circuit has not taken a crabbed view of public right.

To summarize this Court's review of the Article I/Article III cases:

*Bakelite* and *Williams* retain their doctrinal force, even if their holdings have been superseded. These cases unmistakably related the authority of the Court of Claims to sovereign immunity. At the time of these decisions, the Court of Claims was considered to be an Article I or legislative court, and it heard takings cases. Importantly, the Court in *Bakelite* linked the general jurisdiction of the Court of Claims over money claims against the United States to Congress's power to pay the debts of the United States. 279 U.S. 438, 452. This link raises the issue of separation of powers, as *Williams* points out. *See* 289 U.S. 553, 480–81. A holding that a monetary claim against the United States must be tried in an Article III court would encroach upon Congress's power to pay the debts of the United States.

Given the fact that the Court of Claims was considered to be an Article I court until 1953, the relevance of *Glidden's* retroactive holding that it was an Article III court all along is hard to assess. *See Glidden v. Zdanok*, 370 U.S. 530, 584 (1962). Its ruling certainly does not entirely vitiate the jurisprudence of earlier cases that held or assumed that the Court of Claims was an Article I court, as we have seen from the continued use of *Bakelite* and *Williams* by the Supreme Court and by the Circuit Courts. *See e.g., Oil States Energy Servs., LLC v. Greene's Energy Group*, _____ U.S. _____, 138 S.Ct. 1365 (2018); *Stern*, 564 U.S. 462 (2011); *Samuels, Kramer & Co. v. Comm'r of Internal Revenue*, 930 F.2d 975 (2d Cir. 1991); *Continental Equities, Inc. v. Comm'r of Internal Revenue*, 551 F.2d 74 (5th Cir. 1977). As an aside, this Court finds the holding in *Glidden* that the Court of Claims was an Article III court even before Congress's declaration to be puzzling, given its practice of giving advisory opinions, not only before 1953, but seemingly, after! *See e.g., Banfi Prods. Corp. v. United States*, 41 Fed. Cl. 581 (Fed. Cl. 1998); *Shane v. United States*, 3 Ct. Cl. 294 (Cl. Ct. 1983); *Mackie v. United States*, 172 Ct. Cl. 393 (Ct. Cl. 1965); *Dickson v. United States*, 159 Ct. Cl. 185 (Ct. Cl. 1962); *Gordon v. United*

*States*, 148 Ct. Cl. 31 (Ct. Cl. 1960); *Love v. United States*, 48 Ct. Cl. 74 (Ct. Cl. 1913).[6]  In any event, the Court of Claims is no more.  *See* Federal Courts Administration Act of 1992, Pub. L. 102-572, Title IX, § 902, 106 Stat. 4506 (1992).

Of the other cases discussed, most notable are the circuit court cases that upheld the constitutionality of the Court of Federal Claims jurisdiction over takings cases.  *Brott* is the most important as it discussed the self-executing nature of the takings clause, the public/private rights distinction, and sovereign immunity, especially as it applies even to rights created by the Constitution.  858 F.3d 425, 432–36 (6th Cir. 2017).

### F.    Jury Trial Requirement

The Seventh Amendment provides (in relevant part): "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ."  U.S. Const. amend. VII.

Plaintiffs' argument that the Seventh Amendment requires that takings claims against the federal government be tried to a jury depends on classifying such claims as suits at common law.  See Pls.' Mot. at 10–11.  Prominent in Plaintiffs' brief on this point is the *City of Monterey* case.  *See* Pls.' Mot. at 10–11; *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687 (1999).  This is not surprising, given the fact that the Court held that a jury trial was required in a section 1983 action involving inverse condemnation.  *City of Monterey*, 526 U.S. at 720–21.  The inverse condemnation part is relevant to the case before this Court, but the section 1983 part is not.  The Court inquired into the common law circa 1791 not to answer the question whether inverse condemnation was a suit at common law, but what suit at common law was analogous to a section 1983 action.  *See id.* at 715–18.  In fact, it is important to note (again) in this context that the Court expressly found that takings cases against the United States were irrelevant to its inquiry: "Most of our regulatory takings decisions have reviewed suits against the United States…. It is settled law that the Seventh Amendment does not apply in these contexts."  *Id.* at 719.

In addition to *Monterey*, Plaintiffs rely primarily on *Monongahela*.  148 U.S. 312 (1893); Pls.' Reply at 6–8, 19.  This case, it may be recalled, held that the determination of just compensation was a "judicial question."  *Monongahela*, 148 U.S. at 327.  Again, this case did not involve an Article I court deciding a takings claim against the United States.  It was a condemnation case brought before a federal circuit court.  Ordinarily, these cases would entail a jury.  Therefore, it is not surprising that the Court would say that determination of just compensation is a question for the jury.[7]

---

[6] It is interesting, however, that the implication of the Court's holding is that judges confirmed and appointed while the Court of Claims was considered to be Article I were deemed to be Article III judges.  *See Glidden*, 370 U.S. at 584 ("Since the Court of Claims and the Court of Customs and Patent Appeals are courts created under Article III, their judges—including retired judges—are and have been constitutionally protected in tenure and compensation.").

[7] Curiously, the plaintiff in the case waived its right to a jury.  *See id.* at 314.

Conspicuously absent from Plaintiffs' briefing is reference to *McElrath*, discussed above. 102 U.S. 426 (1880). This Court has already used this case as authority to prove that a takings case against the federal government is not your garden-variety common law cause of action. *See supra.* Here, this Court wishes to emphasize that part of the opinion that concerns the requirement for a jury trial: "Suits against the government in the Court of Claims . . . are not controlled by the Seventh Amendment. They are not suits at common law within its true meaning." *McElrath*, 102 U.S. at 440.

Finally, having in mind *Monterey's* analogy of a section 1983 case to a tort at common law, this Court notes that Federal Tort Claims Act cases, which are cases against the United States and which are heard in federal district courts, are decided without a jury. *See* 28 U.S.C. § 2402; 28 U.S.C. § 1346(b); *Lehman v. Nakshian*, 453 U.S. 156, 161 & n.8 (1981).

## III.    Conclusion

From the above, this Court concludes that it is not a violation of Article III for Congress to confide takings claims against the federal government in excess of $10,000 to the exclusive jurisdiction of the Court of Federal Claims, a court established under Article I. In addition, this Court concludes that the Seventh Amendment does not require a jury trial for such cases.

Article III does not require Congress to establish any federal courts other than the Supreme Court. Consequently, Congress may grant the judicial power of the United States to them as it wills. *See United States v. Union Pac. R.R. Co.*, 98 U.S. 569, 602 (1878) ("The discretion . . . of Congress as to the number, the character, the territorial limits of the courts among which it shall distribute [the] judicial power, is unrestricted except as to the Supreme Court."). Plaintiffs' interpretation of the self-executing nature of the Fifth Amendment takings clause would *require* Congress to establish an Article III court to hear cases brought pursuant to it. This result is clearly contrary to Congress's plenary power over inferior courts in Article III. *Patchak v. Zinke*, _____ U.S. _____, 138 S.Ct. 897, 906 (2018) ("So long as Congress does not violate other constitutional provisions, its 'control over the jurisdiction of federal courts' is 'plenary.'"); *See also Bowles v. Russell*, 551 U.S. 205, 212–13 (2007) ("Because Congress decides whether federal courts can hear cases at all, it can also determine when, and under what conditions, federal courts can hear them."). The proper interpretation of the self-executing nature of the takings clause is that it is not necessary for Congress to pass legislation holding the United States liable to pay just compensation for a taking. This interpretation leaves intact the doctrine of sovereign immunity. Therefore, no one may sue the United States for a taking unless Congress has provided a forum to do so. *See Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985) ("taking claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act, 28 U.S.C. § 1491.").

Congress may create a court to hear takings cases either under Article I or Article III. That Congress may establish an Article I court to do so is based on the public/private right distinction. Cases involving public right may be heard in Article I courts. *See Crowell v. Benson*, 285 U.S. 22, 50–51 (1932). Although this distinction has not been clearly defined by

the Supreme Court, a takings claim against the federal government is a matter of public right. Indeed, the Supreme Court has held that disputes between private parties might be matters of public right under certain circumstances. *See e.g.*, *Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568 (1985); *Block v. Hirsh*, 256 U.S. 135 (1921); *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 18 How. 272 (1856). Congress's control over compensating takings claims derives from its constitutional power to pay the debts of the United States. *United States v. Sherwood*, 312 U.S. 584, 587 (1941); *Ex parte Bakelite*, 279 U.S. 438, 452 (1929).

Takings cases against the federal government are not common law causes of action. Therefore, trial by jury is not required by the Seventh Amendment. *McElrath v. United States*, 102 U.S. 426, 440 (1880).

Throughout most of the history of the United States under the current constitution, takings claims against the federal government were not heard in Article III courts. Prior to 1855, just compensation was provided only through private bills. *United States v. Bormes*, 568 U.S. 6, 11 (2012); *United States v. Mitchell*, 463 U.S. 206, 212 (1983). After the Court of Claims was established in 1855, payment according to its findings was still a matter of congressional largesse. The Court of Claims did not achieve final judgment authority effectively until 1866. *See* Act of March 17, 1866, ch. 19, sec. 1, 14 Stat. 9. The Court of Claims and its successor, the Court of Federal Claims, has had clear statutory authority over takings claims since the Tucker Act in 1887. *Compare* Act of February 24, 1855, ch. 122, 10 Stat. 612 ("[The Court of Claims] shall hear and determine all claims founded upon any law of Congress . . . ."), *with* Act of March 3, 1887, ch. 359, 24 Stat. 505 ("the Court of Claims shall have jurisdiction to hear and determine . . . All claims *founded upon the Constitution of the United States* or any law of Congress . . . .") (emphasis added). Until the *Glidden* case was decided, it was generally thought that the Court of Claims was an Article I court until 1953, when Congress declared it to be an Article III court. *See* Act of July 28, 1953, 67 Stat. 226; *Glidden Co. v. Zdanok*, 370 U.S. 530 (1962); *Williams v. United States*, 289 U.S. 553 (1933); *Bakelite*, 279 U.S. 438 (1929). The Court of Claims was established as an Article I court in 1982 and retained jurisdiction over claims against the federal government "founded upon the Constitution." *See* Federal Courts Improvement Act of 1982, Pub. L. No. 97-164, 96 Stat. 25 ("[The United States Claims Court] is declared to be a court established under article I of the Constitution of the United States"); Act of March 3, 1887, ch. 359, 24 Stat. 505 (granting jurisdiction over "claims founded upon the Constitution of the United States").

The judges of the Court of Federal Claims are appointed by the President of the United States after confirmation by the Senate. 28 U.S.C. § 171. Although they have 15-year terms, 28 U.S.C. § 172, once the term ends, failing reappointment, they continue to serve as judges until death, disabled or voluntarily retired. 28 U.S.C. § 178. Effectively, this a life term. Their compensation is pegged to that of the district court judges. 28 U.S.C. § 172(b). They may be removed by the Federal Circuit, 28 U.S.C. § 176, but this provision may be unconstitutional. Thus, the judges of the Court of Federal Claims are as independent as Article I judges could be. In my 20 years on this Court—seven of them as Chief Judge—I have never heard that any judge was instructed by a government official to decide a case in a certain way.

In sum, Plaintiffs' argument that the Court of Federal Claims lacks subject matter jurisdiction to hear takings cases is unavailing.  Accordingly, Plaintiffs' Motion to Transfer is hereby **DENIED**.  In addition, Plaintiffs' request for oral arguments is **DENIED** as moot.

Finally, Plaintiffs' requested a stay of proceedings and certification to appeal the issues in the event the Court denies their Motion to Transfer.  Although transfer is inappropriate in this case, Plaintiffs' Motion raises a controlling question of law to which there are substantial grounds for difference of opinion, and an immediate appeal from this order may materially advance the ultimate termination of the litigation.[8]  *See* 28 U.S.C. § 1292(d)(2).  Therefore, the Court hereby **STAYS** all proceedings until the United States Court of Appeals for the Federal Circuit issues a decision on the following question:

> Whether it is a violation of Article III of the U.S. Constitution for Congress to provide that the U.S. Court of Federal Claims has jurisdiction to hear claims for just compensation pursuant to the Fifth Amendment.

The parties shall file a Joint Status Report within 30 days from the date of a final decision from the Federal Circuit.

**IT IS SO ORDERED.**

s/ Edward J. Damich
EDWARD J. DAMICH
Senior Judge

---

[8] The Federal Circuit recently heard a case involving the jurisdictional issue raised here, but did not address the merits of the challenge due to the movant's status as an intervener.  *See Fairholme Funds, Inc. v. United States*, 132 Fed. Cl. 49 (Fed. Cl. 2017) (Sweeney, C.J.), *aff'd*, 681 Fed. Appx. 945 (Fed. Cir. 2017).